

# NUMBER 13-06-00653-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

COLIN KAUFMAN,                                                    Appellant,

v.

THE STATE OF TEXAS,                                               Appellee.

### On appeal from the 214th District Court
### of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Benavides
### Memorandum Opinion by Justice Garza

This is an appeal from a conviction for misapplication of fiduciary property of a value greater than $200,000. *See* TEX. PENAL CODE ANN. § 32.45(b), (c)(7) (Vernon Supp. 2007). A jury found appellant, Colin Kaufman, guilty and assessed punishment at 45 years' imprisonment and a $10,000 fine. Kaufman now challenges his conviction, contending that (1) there was no evidence adduced at trial that Kaufman himself held property as a fiduciary, and (2) the trial court erred by permitting the introduction of evidence of extraneous bad acts previously committed by Kaufman. We affirm.

## I. Background

This case centered upon the administration of trust and estate assets of Arthur Wilson Carothers, a former Army colonel and World War II veteran residing in Corpus Christi. Throughout the 1990s, Carothers executed various legal documents providing that accountant Andrew Huffmeyer would exercise control over his estate in the event of his incapacitation or death. On January 12, 2002, Carothers was struck by a vehicle and fell into a coma. He died on May 16, 2002.

Shortly after Carothers became incapacitated, Huffmeyer hired Kaufman, a Harvard-educated former attorney and law professor, and other attorneys to assist him in his role as Carothers' attorney-in-fact and as trustee of Carothers' inter vivos trust. Between January 2002 and April 2003, while in the care of Huffmeyer and his attorneys, the corpus of Carothers' estate was depleted by over $500,000 due to the charging of legal and other professional fees. In April 2003, a successor trustee, Eric Anthony, was appointed to administer Carothers' estate.

On November 10, 2005, a Nueces County grand jury indicted Kaufman and Huffmeyer on charges of felony theft and misapplication of fiduciary property of a value greater than $200,000, both first-degree felony offenses. *See id.* § 31.03 (Vernon Supp. 2007), § 32.45.[1] Prior to trial, Huffmeyer entered into a plea agreement with the State

---

[1] Specifically, the second count of the indictment alleged that:

COLIN KAUFMAN and ANDREW HUFFMEYER, defendants, in Nueces County, Texas, on or about and between FEBRUARY 15, 2002 and APRIL 25, 2003, did then and there intentionally, knowingly, and recklessly misapply property, to wit: UNITED STATES CURRENCY, checks and money, of the value of more than $200,000, that the said defendants held as a fiduciary in a manner that involved substantial risk of loss to ARTHUR WILSON CAROTHERS, individually and in his capacity as beneficiary of the ARTHUR WILSON CAROTHERS TRUST, ERIC ANTHONY, in his capacity as Executor of the Estate of Arthur Wilson Carothers, and the ARTHUR WILSON CAROTHERS TRUST, and the successor beneficiaries of that trust, in their capacity as the heirs of the Estate of Arthur Wilson Carothers, the owner of said property, and the persons for whose benefit the property was held, by dealing with said property contrary to the agreement under which they held said property, to wit: by withdrawing various amounts of money on numerous occasions during said period of time from the said trust and from other financial accounts belonging to said owners for professional and fiduciary services that were not rendered or were of little or no benefit to the said owners and at a rate of compensation that exceeded the amount clearly stated in the trust agreement and that was clearly unreasonable for the services rendered, against the peace and dignity of the State.

2

under which he pledged to plead guilty to the second count of the indictment and to testify against Kaufman. In exchange, the State agreed to recommend a sentence of five years' imprisonment for Huffmeyer. The trial proceeded against Kaufman. Testimony at the trial, which was held before a jury from November 13 to 20, 2006, revealed the details of how the value of Carothers' estate was depleted by over half a million dollars by Huffmeyer and his attorneys over the course of approximately sixteen months.

## A. Testimony of Cheryl Whited

Carothers' will and trust documents were first drafted in 1992 by attorney Cheryl Whited, who is board certified in estate planning and probate law. Whited testified that, at the behest of Carothers, changes were made to the trust document later in 1992 and again in 1993 and 1994. On May 17, 1995, Carothers directed Whited to completely rewrite the will and trust documents, and to prepare a durable power of attorney.[2]

The will named Huffmeyer as executor of the estate and Whited as alternate executor. Under the will, Carothers bequeathed his vehicle to his friend Mary Helen Kugler, and his furniture and other personal effects to the Salvation Army of Corpus Christi. The will also stated that:

> I may leave a written statement or list disposing of certain items of my tangible personal property. Any such statement or list in existence at the time of my death shall be determinative with respect to all items devised therein. If no written statement or list is found and property identified by my Executor within thirty (30) days after my Executor's qualification, it shall be presumed that there is no such statement or list and any subsequently discovered statement or list shall be ignored. While I understand that such written statement or list may not be binding upon my executor, it is my wish that such written statement or list be given effect.

The will further provided that the remainder of the estate would pour over into Carothers' inter vivos trust, entitled simply the "Arthur Wilson Carothers Trust." The trust instrument provided that Carothers himself would be the initial trustee and that Huffmeyer would be the successor trustee if Carothers became incapacitated or died. The trust was

---

[2] The will, trust document, and durable power of attorney executed by Carothers on May 17, 1995 remained operative at the time of his incapacity and death. These are the documents which we will refer to herein as the "will," "trust," and "durable power of attorney."

3

established with specific details as to how Carothers' assets were to be distributed, and how the trust was to be terminated, upon Carothers' death.

The trust instrument commanded the trustee to distribute Carothers' assets upon his death. First, his vehicle, furnishings, and personal effects were to be distributed according to the terms of his will. The remainder of his estate was to be divided among various family members and acquaintances of Carothers. The first $100,000 in assets was to go to Kugler if she survived Carothers; that gift would lapse if she did not survive him. The second $50,000 in assets was to go to Carothers' step-granddaughter, Mary Kathleen Kridler, if she survived Carothers, and if she did not, to her son Austin Kridler. The next $25,000 in assets was to go to Carothers' step-daughter, Judith Margaret Vance, or to Mary Kathleen Kridler if Vance did not survive Carothers; and the next $25,000 would go to Carothers' step-daughter-in-law, Sandra Turner, if she survived him. Finally, $100,000 was to be distributed to the Indiana University Foundation to support a group of scholarships. After these specific bequests, the residue and remainder of the trust corpus was to be distributed to the United Methodist Church in Mulberry, Indiana, for the Music, Building and Maintenance Fund, in the name and memory of Carothers' late wife, Lois Ann Carothers.

Additionally, the trust document provided that:

> [t]he Trustee shall be entitled to receive reasonable compensation for the services of the Trustee hereunder. The hourly rate of $65.00 to $75.00 per hour shall be deemed to be reasonable compensation of A. F. Huffmeyer for purposes of this Agreement. The hourly rate of $140.00 pre [sic] hour shall be deemed to be reasonable compensation of Cheryl A. Whited for purposes of this Agreement.

The durable power of attorney, also signed on May 17, 1995, named Huffmeyer as Carothers' attorney-in-fact, and named Whited as his successor upon Huffmeyer's death, disability, resignation, or refusal to act. The durable power of attorney was effective immediately upon its execution and it granted Huffmeyer all the powers available to an attorney-in-fact under the Durable Power of Attorney Act. *See* TEX. PROB. CODE ANN. §§

4

481–506 (Vernon 2003).[3]

Whited testified that, upon being informed by Huffmeyer of Carothers' injury and incapacitation, she faxed to Huffmeyer a letter composed by Carothers on May 17, 1995 and addressed to Huffmeyer. The letter contained a comprehensive seventeen-point list of various items of information and instructions to be carried out by Huffmeyer upon Carothers' death. The letter, remarkable in its scope and detail, included the following:

- A list of addresses and phone numbers of military agencies to notify upon Carothers' death, including the Adjutant General's Office in Washington, D.C. and the Defense Finance Accounting Service in Cleveland, Ohio;

- Details of Carothers' burial insurance policy with Guardian Plans, Inc., including policy number and contact information;

- The name and contact information of the funeral home in Corpus Christi that Carothers designated to be in charge of his burial arrangements, along with a statement that the funeral home director also had been provided with written instructions;

- Details of the specific plot in which Carothers planned to be interred at Fort Sam Houston National Cemetery and the procedure to follow under which he would be interred next to his first wife;

- A statement that Carothers wished to have a closed casket immediately upon his death, and that he did not desire any funeral service or pall bearers;

- Carothers' Medicare account number and details of Carothers' supplemental health insurance policy with the Retired Officers Association, including policy number and contact information;

---

[3] Specifically, the statutory durable power of attorney gave Huffmeyer the power to act on Carothers' behalf in the following contexts:

    (A)  real property transactions;
    (B)  tangible personal property transactions;
    (C)  stock and bond transactions;
    (D)  commodity and option transactions;
    (E)  banking and other financial institution transactions;
    (F)  business operating transactions;
    (G)  insurance and annuity transactions;
    (H)  estate, trust, and other beneficiary transactions;
    (I)  claims and litigation;
    (J)  personal and family maintenance;
    (K)  benefits from social security, Medicare, Medicaid, or other governmental programs or civil or military service;
    (L)  retirement plan transactions; [and]
    (M)  tax matters[.]

TEX. PROB. CODE ANN. § 490 (Vernon 2003) (form for statutory durable power of attorney).

- A statement that Carothers, as a retired Army officer, was entitled to hospitalization and medical care at any Army, Navy, or Air Force Hospital, if space is available, along with Carothers' Army Identification Card number;

- A statement that Carothers, as a World War II veteran, was entitled to hospitalization and medical care at any VA Hospital;

- A statement that, in the event of an incapacitating injury, Carothers "[did] not want any heroic medical efforts or experiments used to prolong or sustain my life by artificial or mechanical means" and that he "wish[ed] to be permitted to die a natural death";

- An inventory of items in Carothers' safety deposit box at Nations Bank in Corpus Christi, which included his insurance policies, several certificates of deposit, and copies of his birth certificate and will;

- Details of Carothers' Merrill Lynch brokerage account and Nations Bank checking account;

- A comprehensive inventory of documents contained in Carothers' filing cabinet at his apartment in Corpus Christi, organized by drawer; and

- A statement that Carothers had no debts.

In short, Carothers' letter provided Huffmeyer with virtually everything he needed to know in order to fully and efficiently administer his estate.

Whited testified that when she drafted the various estate documents, Carothers' assets were primarily in money market funds which are "very easy to distribute" because they "can be converted to cash instantly." Carothers also had established several payable-on-death certificate of deposit accounts for the benefit of several different beneficiaries. Whited explained to the jury that money held in such an account would go directly to the beneficiary upon the account holder's death, without going into probate. However, when Carothers became incapacitated, Huffmeyer liquidated those payable-on-death accounts using his power of attorney and transferred the funds to an account in the name of the trust.

Overall, Whited stated that "it was very clear where [Carothers] wanted things to go" and that she "wouldn't consider it an unusually difficult estate or trust to administer by any means." She also testified that, in her professional opinion, based on the specific circumstances regarding Carothers' estate, the fees charged by the trustee in this case

6

should have been no more than $16,800, including any fees charged by the trustee's attorney.

## B.    Testimony of Beneficiaries

Also testifying for the State was Steve Nordin, Carothers' nephew. Nordin is the son of Alma Williams, Carothers' sister and a beneficiary under a $25,000 payable-on-death account set up by Carothers. On July 17, 2002, Nordin wrote to Huffmeyer on behalf of his mother, inquiring as to the status of the account. Huffmeyer replied on October 29, 2002, over five months after Carothers' death, stating that "the preparation for filing letters testamentary for the estate of Mr. Arthur W. Carothers is continuing and is almost complete" and "it is necessary to complete the probate procedure prior to and [sic] distributions to any Trust beneficiaries."

Nordin testified that Carothers continued to receive his monthly pension checks from the Army after his death, and that Nordin contacted the Army and discovered that they had not been notified of his uncle's death. Upon learning that his uncle had left substantial amounts of money to Indiana University and the Mulberry Methodist Church, Nordin contacted the university and the church on September 20, 2002. Nordin testified that neither the university nor the church were aware of Carothers' death as of the time he contacted them. Nordin later learned that, not only did Carothers open a payable-on-death account for the benefit of his mother, but a separate $51,000 had been deposited by Carothers in payable-on-death accounts for his direct benefit. Neither Nordin nor Williams ever received the funds designated for them in the payable-on-death accounts.

The State also presented testimony by Allen Kugler, son of Carothers' friend Mary Kugler. Allen testified that his mother received the car and money left to her by Carothers several months after he died, and that the car and money were delivered to his mother not by Huffmeyer but by Anthony, the successor trustee.

## C.    Testimony of Andrew Huffmeyer

Huffmeyer's testimony confirmed the events recounted by Whited and the trust

7

beneficiaries. Huffmeyer first met Carothers in 1993; he was asked by Carothers in 1995 to serve as the executor of his estate because Carothers had no family in the area. Huffmeyer acknowledged that the will, trust, and power of attorney gave him the power to act in a fiduciary capacity on behalf of Carothers, and that after Carothers died, he was to handle the trust corpus for the benefit of the beneficiaries of the trust and the will.

Because Huffmeyer had not previously served as a trustee or estate executor, he believed he needed to hire an attorney to advise him. Huffmeyer explained to the jury that, when Carothers became incapacitated, he hired Colin Kaufman and his wife, Sharon Kaufman, whom he also believed to be an attorney. Huffmeyer also hired attorney Gene Garcia to advise him on how to proceed. When Huffmeyer, Kaufman, and Garcia first met together, they decided that Garcia would represent the trust and that Kaufman would represent Carothers individually while he was in the hospital. When Carothers died, another attorney, Vivian Cavada, was hired to represent the estate, and Kaufman came to represent Huffmeyer as trustee. Another attorney, Stonewall Van Wie, was also hired to do work for the estate.[4]

According to Huffmeyer, Kaufman was substantially involved in the administration of Carothers' estate. Huffmeyer claimed that Kaufman advised, encouraged, and directed him on how to carry out his duties as Carothers' executor, trustee, and attorney-in-fact. Kaufman would periodically bill Huffmeyer for services provided by him and his wife; Huffmeyer would then pay Kaufman by check drawn on the trust accounts. Huffmeyer acknowledged that he was aware that the trust instrument limited the amount he could charge for his services to $75 per hour; nevertheless, he charged $200 per hour and Kaufman charged $400 per hour. Kaufman's wife charged $115 per hour for paralegal work.

---

[4] After Carothers died, Huffmeyer waited nearly six months before seeking letters testamentary, which Kaufman told him was normal. When Huffmeyer was asked whether he "blindly rel[ied]" on Kaufman's advice on "issues regarding the administering [of] the estate and seeking letters [testamentary]," Huffmeyer responded in the affirmative.

8

Among the first acts undertaken by Huffmeyer upon learning of Carothers' incapacity was to close the payable-on-death accounts using his power of attorney and transfer the approximately $180,000 of funds held in those accounts to an account in the name of the trust. Huffmeyer testified that he knew this would defeat the interests of the beneficiaries of the accounts, yet he stated that either Kaufman or Garcia told him that closing those accounts was "perfectly legal." On March 19, 2002, Huffmeyer wrote Kaufman a check for $25,000 and himself a check for $20,000 out of the new trust account. As of May 31, 2002, Huffmeyer paid Kaufman $105,000 in attorney's fees out of the account. By September of 2002, $140,000 out of the original $180,000 taken from the payable-on-death accounts had been paid out as professional service fees to Kaufman and Huffmeyer.[5] Huffmeyer testified that he believed some of the money paid to Kaufman were advances to cover legal work to be performed in the future.

In all, Kaufman charged approximately $161,000 for various conferences with Huffmeyer and the other attorneys, held mostly at Corpus Christi restaurants; over $7,393 to attend Carothers' funeral, which Carothers specifically stated in his letter of May 17, 1995 that he did not desire; over $88,000 for a detailed inventory of Carothers' apartment, ostensibly to search for a "written statement or list" disposing of assets which Carothers' will indicated might exist; over $29,000 for drafting a new trust agreement for Carothers, even though Carothers, at the time, was incompetent to approve it; and over $94,000 for litigation fees. Further, Huffmeyer, Kaufman, and Kaufman's wife together billed $49,702 to travel to Delaware and San Antonio to change signature cards on the payable-on-death accounts and other bank accounts owned by Carothers.

## D.    Testimony of Jim Clancy and Eric Anthony

Jim Clancy, attorney for trust beneficiary Indiana University, became aware that

---

[5] When the probate was pending, Huffmeyer filed an application requesting that the probate court authorize the estate to pay money to the payable-on-death account beneficiaries. One of the trust beneficiaries objected to that request, and the court eventually denied that request.

Carothers bequeathed money to his client after being contacted by Nordin.[6] At trial, Clancy testified that after repeatedly trying and failing to communicate with Huffmeyer, he filed suit for an accounting of the estate and trust assets in district court. *See* TEX. PROP. CODE ANN. § 113.151 (Vernon 2007).[7]

Moreover, Clancy was qualified by the trial court as an expert on attorney's fees, and he reviewed itemized bills prepared by Huffmeyer and Kaufman for their services to the trust. Clancy testified that Kaufman and Huffmeyer's travel expenses, in particular, were "ridiculous," as he believed it was not necessary for a trustee to appear in person at a bank to change a signature card; and in any event, it certainly was not reasonable or necessary for the trustee to take an attorney and paralegal with him. He also opined that the number of conferences held by Huffmeyer and his attorneys, as well as the length and location of those conferences, were unusual in his experience. Finally, Clancy testified that the amounts charged for litigation with beneficiaries seeking an accounting was unnecessary because beneficiaries were entitled to an accounting upon a simple request. *See id.*

Huffmeyer was eventually removed as trustee by the district court in April 2003, and attorney Eric Anthony was appointed as his successor. *See id.* §§ 113.082–.083 (Vernon 2007) (providing for the removal of trustee and appointment of successor trustee by the court). A subsequent accounting revealed that between February 1, 2002, and February 28, 2003, the value of the trust assets decreased from $961,798.41 to $448,773.59, a difference of $513,024.82. A substantial part of the decrease was due to fees charged

---

[6] Clancy was later also retained by the Mulberry Methodist Church, another trust beneficiary.

[7] Section 113.151(a) of the Texas Property Code provides in relevant part the following:

A beneficiary by written demand may request the trustee to deliver to each beneficiary of the trust a written statement of accounts covering all transactions since the last accounting or since the creation of the trust, whichever is later. If the trustee fails or refuses to deliver the statement on or before the 90th day after the date the trustee receives the demand or after a longer period ordered by a court, any beneficiary of the trust may file suit to compel the trustee to deliver the statement to all beneficiaries of the trust.

TEX. PROP. CODE ANN. § 113.151(a) (Vernon 2007).

against the trust for professional services—Kaufman was paid a total of $285,000 out of the trust; Huffmeyer was paid $144,321.44; Garcia was paid $30,000; and Cavada and Van Wie were each paid $5,000.[8]

Still, Clancy testified that the trust beneficiaries Kugler, Vance, Kridler, and the university were paid their full distributions in December of 2003. However, the church did not receive its full distribution. According to Clancy, had there been no wrongdoing, the church should have received just under $500,000. Additionally, Clancy testified that had Huffmeyer and his associates not closed the payable-on-death accounts, Kugler would have received an additional $130,000. Anthony testified that when he took over as trustee, eleven months after Carothers' death, most of the instructions provided by Carothers in his May 17, 1995 letter had not been carried out. Anthony further testified that he could have taken care of all of Carothers' estate and trust business for roughly $5,000 in fees.

### E. Testimony of Colin Kaufman

Kaufman testified in his defense, claiming first, with respect to the payable-on-death accounts, that he advised Huffmeyer that he had the power to close those accounts but did not advise him to actually close them. He explained that the travels to Delaware and San Antonio were necessary because they were required by the banks; but he stated that he could not recall why it was necessary to take a paralegal—his wife—along with them. He testified that he was not aware of Clancy's attempts to contact Huffmeyer until the suit for accounting was brought. Kaufman denied padding his bills to the trust or billing the trust for work he did not do. He denied doing work for the trust that was unreasonable or unnecessary.

Prior to Kaufman's testimony, the State filed a motion under Texas Rule of Evidence 404(b) to admit evidence of extraneous bad acts committed by Kaufman. *See* TEX. R.

---

[8] The State introduced a "Summary of Fee Bills" into evidence which summarized the charges made by Huffmeyer and his associates to the estate and trust. In all, $597,687.50 in professional service fees were deducted from trust accounts; this included $104,634 for "Cataloguing and reviewing every document in Mr. Carothers' [a]partment," $261,704.50 for "Conferences between Huffmeyer and his lawyers usually at restaurants," and $94,107 for "Litigation with the beneficiaries resisting accounting."

11

EVID. 404(b). Specifically, the State sought to introduce court-certified documents showing that Kaufman, between 1992 and 2002, had breached ethical and legal responsibilities in his role as trustee in a bankruptcy case styled as *In re Charles Feldman d/b/a Charles Feldman Investments*. In that case, Kaufman was appointed as trustee of the Feldman bankruptcy estate in 1992 but was removed in 2001 upon a finding by the United States Bankruptcy Court for the Southern District of Texas that he had filed insufficient accountings, had failed to make required semi-annual disbursements required by the bankruptcy plan, and had paid himself fees before they were earned. Kaufman was ordered by the bankruptcy court, in a decision affirmed by the United States District Court for the Southern District of Texas, to disgorge some $214,871.89 in attorney's fees that he had paid himself from estate assets. Kaufman objected to the introduction of these documents, claiming that they were inadmissible: (1) as irrelevant; (2) as character evidence shown to prove conduct; and (3) because the case was on appeal and not final. The State argued that the extraneous act evidence was admissible because it was offered not to show Kaufman's character but was probative with regard to Kaufman's intent, knowledge, and absence of mistake. *See id.* The Court overruled Kaufman's objections and admitted the documents.

The State also offered court-certified documents showing that Kaufman had been disbarred in the states of Texas and Kansas. The reason for the disbarments was Kaufman's wrongdoing in the *Feldman* bankruptcy case. Kaufman objected to the admission of the disbarment orders, noting that they were on appeal and not final; however, the trial court admitted the documents.

The trial court, applying the law of parties, instructed the jury in Section VI of the jury charge as follows:

> Now, if you find from the evidence beyond a reasonable doubt that **Andrew Huffmeyer**, in Nueces County, Texas, on or about and between February 15, 2002 and April 25, 2003, did then and there intentionally, knowingly or recklessly misapply property, to wit: United States Currency, checks or money, of the value of more than $200,000, that **Andrew**

12

**Huffmeyer** held as a fiduciary, in a manner that involved substantial risk of loss to . . . the owners of said property, and the persons for whose benefit the property was held, by dealing with said property contrary to the agreement under which the defendant held the property, to wit: by withdrawing various amounts of money on numerous occasions during said period of time from the said trust and from other financial accounts belonging to said owners, for professional and fiduciary services that were not rendered or were of little or no benefit to the said owners, and at a rate of compensation that exceeded the amount clearly stated in the trust agreement, and that was clearly unreasonable for the services rendered;

And you further find that the defendant, **Colin Kaufman**, in Nueces County, Texas, on or about and between February 15, 2002 and April 25, 2003, with the intent to promote, aid or assist the commission of the misapplication of fiduciary property by Andrew Huffmeyer, did then and there promote, aid or assist the said Andrew Huffmeyer in the commission of misapplication of fiduciary property, then you will find the defendant "Guilty" as a party to the offense of Misapplication of Fiduciary Property as alleged in the indictment.

But if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

The jury returned a verdict of guilty. After the punishment phase, the jury assessed Kaufman's punishment at 45 years' imprisonment and a $10,000 fine. This appeal ensued.[9]

## II. DISCUSSION

### A. Sufficiency of the Evidence that Kaufman Held Property as a Fiduciary

By his first issue, Kaufman claims that the evidence adduced at trial was legally insufficient to prove that he held property as a fiduciary and, therefore, that he cannot be found guilty as a principal under section 32.45 of the penal code. *See* TEX. PENAL CODE ANN. § 32.45.[10] Kaufman's entire argument on this issue consists of the following:

---

[9] We note that, although he had previously filed a brief prepared by counsel, Kaufman subsequently filed a pro se supplemental brief on October 26, 2007. He did this despite this Court's denial of his "Original Motion to File a Pro Se Brief" on October 1, 2007. We will consider only the points raised in his original brief. *See* TEX. R. APP. P. 38.1(e) (stating that the appellate brief "must state concisely all issues or points presented for review."); *see also Marshall v. State*, 210 S.W.3d 618, 620 n.1 (Tex. Crim. App. 2006) (stating that a criminal defendant does not have a right to hybrid representation), *cert. denied*, 2007 U.S. LEXIS 9543 (U.S. Oct. 1, 2007).

[10] Texas Penal Code section 32.45 states that:

A person commits an offense if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary or property of a financial institution in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the

13

Before one can be found guilty as a principal under Penal Code Section 32.45, the person must "hold property" as a fiduciary. There is no evidence in the record of any legal document or event which caused defendant Kaufman to hold property of another. See Section 111.004, Texas Property Code. A trust must be in writing to be enforceable. Section 112.004, Texas Property Code. That statute requires a trust in either real or personal property to be created with a written document.

Generally, in examining the legal sufficiency of evidence, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Watson v. State*, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006). Here, however, it is unnecessary to undertake such an examination, because Kaufman was not actually convicted as a principal under penal code section 32.45; rather, he was convicted as a party to the offense committed by Huffmeyer. This is permitted under the law of parties, which is codified in chapter 7 of the penal code. *See* TEX. PENAL CODE ANN. §§ 7.01–.24 (Vernon 2003).

Specifically, section 7.01 provides that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a). Section 7.02 states that "[a] person is criminally responsible for an offense committed by the conduct of another if: . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ." *Id.* § 7.02(a)(2). Under this theory, the State is able to enlarge a defendant's criminal responsibility to acts in which he may not be the principle actor. *Goff v. State*, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996); *Romo v. State*, 568 S.W.2d 298, 300 (Tex. Crim. App. 1977); *see Amaya v. State*, 733 S.W.2d 168, 174 (Tex. Crim. App. 1986) (applying the law of parties to a misapplication of fiduciary property charge). Moreover, a trial court may charge on the law of parties even where there is no such allegation in the indictment. *Goff*,

---

property is held.

TEX. PENAL CODE ANN. § 32.45(b) (Vernon Supp. 2007).

931 S.W.2d at 544 n.5; *Crank v. State*, 761 S.W.2d 328, 352 (Tex. Crim. App. 1988); *see also* TEX. PENAL CODE ANN. § 7.01(c) (stating that "[a]ll traditional distinctions between accomplices and principals are abolished by this section, and each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice.").

It is undisputed that Huffmeyer held property as a fiduciary for Carothers and the beneficiaries of his estate and trust. The jury charge specifically tracked the statute in stating that, in order to return a guilty verdict, the jury must find that Kaufman "with the intent to promote, aid or assist the commission of the misapplication of fiduciary property by Andrew Huffmeyer, did then and there promote, aid or assist the said Andrew Huffmeyer in the commission of misapplication of fiduciary property."

Kaufman does not challenge the sufficiency of the evidence adduced at trial showing that Huffmeyer "intentionally, knowingly, or recklessly misapplie[d] property he [held] as a fiduciary . . . in a manner that involve[d] substantial risk of loss to the owner of the property or to a person for whose benefit the property is held." *See* TEX. PENAL CODE ANN. § 32.45. Nor does he challenge the sufficiency of the evidence showing that Kaufman, acting with intent to promote or assist the commission of misapplication of fiduciary property, solicited, encouraged, directed, aided, or attempted to aid Huffmeyer in committing that offense. *See id.* § 7.02(a)(2). Therefore, even if we were to agree with Kaufman that the evidence was legally insufficient to show that he personally held property as a fiduciary, we must still uphold his conviction as a party to the offense committed by Huffmeyer. Kaufman's first issue is overruled.

## B.     Evidence of Extraneous Bad Acts

By his second issue, Kaufman claims that the trial court erred in admitting evidence regarding Kaufman's wrongdoing in the Feldman bankruptcy case. We review a trial court's ruling on the admission of evidence for abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Green v. State*, 934

15

S.W.2d 92, 101-02 (Tex. Crim. App. 1996).

Kaufman claims first that the evidence was inadmissible because the orders issued by the Bankruptcy Court and by the United States District Court were "not final." Kaufman asserts that the orders were, at the time, on appeal to the United States Court of Appeals for the Fifth Circuit. Kaufman also asserts that, even if the orders were final, the bad acts revealed in the court orders were too remote to have probative value. *See* TEX. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.").[11]

The State contends, however, that Kaufman waived these arguments by failing to object to the admission of the disbarment orders that specifically referenced the acts of misconduct in the Feldman bankruptcy. We agree. To preserve error in admitting evidence, a party must make a proper objection and get a ruling on that objection. *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (citing *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)). In addition, a party must object each time the inadmissible evidence is offered or obtain a running objection. *Id.* Moreover, the admission of inadmissible evidence can be rendered harmless if the same or similar evidence is introduced without objection elsewhere during trial. *Elder v. State*, 132 S.W.3d 20, 27 (Tex. App.–Fort Worth 2004, pet ref'd).

Here, the State introduced as its Exhibit Number 50 a Judgment of Disbarment dated October 4, 2004, rendered by the Honorable Robert C. Cheshire, Specially Assigned Presiding Judge of the 214th Judicial District of Nueces County. The judgment incorporated a jury verdict finding the following with respect to Kaufman's actions in the Feldman

---

[11] Generally, evidence of extraneous bad acts is inadmissible if it does not have relevance apart from character conformity. TEX. R. EVID. 404(b); *see Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). However, such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absense of mistake or accident. TEX. R. EVID. 404(b); *see Johnston v. State*, 145 S.W.3d 215, 219 (Tex. Crim. App. 2004).

bankruptcy:

> Respondent Colin K. Kaufman failed to hold funds belonging in whole or in part to clients or third parties that were in his possession in connection with a representation, separate from his own funds.

> Respondent, Colin K. Kaufman, after receiving funds in which a client or third person had an interest, upon request by the client or third person, failed promptly to render a full accounting regard [sic] such funds.

> Respondent, Colin K. Kaufman, after receiving funds in which a client or third person had an interest, failed promptly to deliver to the client or third person any funds that the client or third person was entitled to receive.

> Respondent, Colin K. Kaufman, charged or collected an unconscionable fee.

> Respondent, Colin K. Kaufman, engaged in conduct involving dishonesty, deceit or misrepresentation in connection with the Feldman bankruptcy estate.

> The Judgment of Disbarment also stated that Kaufman:

> shall pay restitution to the State Bar of Texas for the benefit of the bankruptcy estate of Charles B. Feldman d/b/a Charles Feldman Investments, pending in the United States Bankruptcy Court, Southern District of Texas, Case Number 90-01254-B-11 in the amount of two hundred fourteen thousand eight hundred seventy-one and 89/100 dollars ($214,871.89), pursuant to United States Bankruptcy Court, Southern District of Texas, Corpus Christi Division *Final Judgment* in said case dated March 12, 2002.

The State also introduced as its Exhibit 51 an Order of Disbarment dated August 30, 2006, issued by the Supreme Court of Kansas. The Kansas order references the Texas order and states that "it was found that the respondent failed to properly safeguard client funds, failed to promptly disburse client funds, charged an unconscionable fee, and engaged in conduct involving dishonesty, deceit, or misrepresentation in connection with a bankruptcy client."[12]

Although Kaufman did object to the admission of the disbarment orders at trial, he did so solely on the basis that the orders were not final because they were on appeal at the time. However, the record contains nothing, such as a Notice of Appeal, indicating that the disbarment orders were on appeal. Moreover, Kaufman did not object to the admission of

---

[12] At trial, Kaufman was asked by the State's attorney whether the basis for the judgments of disbarment was "the proceedings that happened in the Feldman bankruptcy." Feldman responded, "that's the formal basis for the actions taken."

the disbarment orders on the basis that they included references to extraneous offenses, nor did he ask for a limiting instruction or that the references to the extraneous offenses be redacted from the disbarment orders. *See* Tex. R. Evid. 105(a).[13] We conclude that any error by the trial court in admitting the Feldman bankruptcy orders was cured by the later admission, without an extraneous offense objection, of the disbarment orders which directly referenced the misconduct committed by Kaufman in connection with the Feldman bankruptcy. *See Elder*, 132 S.W.3d at 27.

Kaufman's second issue is overruled.

### III. Conclusion

Having overruled Kaufman's two issues on appeal, we affirm the judgment of the trial court.

DORI CONTRERAS GARZA,
Justice

Do not publish.
Tex. R. App. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 29th day of May, 2008.

---

[13] Texas Rule of Evidence 105(a) provides:

When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly; but, in the absence of such request the court's action in admitting such evidence without limitation shall not be a ground for complaint on appeal.

Tex. R. Evid. 105(a).

18