NUMBER 13-06-00653-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


COLIN KAUFMAN, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 214th District Court 


of Nueces County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Garza and Benavides


Memorandum Opinion by Justice Garza



 This is an appeal from a conviction for misapplication of fiduciary property of a value
greater than $200,000. See Tex. Penal Code Ann. § 32.45(b), (c)(7) (Vernon Supp. 2007). 
A jury found appellant, Colin Kaufman, guilty and assessed punishment at 45 years'
imprisonment and a $10,000 fine. Kaufman now challenges his conviction, contending that
(1) there was no evidence adduced at trial that Kaufman himself held property as a
fiduciary, and (2) the trial court erred by permitting the introduction of evidence of
extraneous bad acts previously committed by Kaufman. We affirm.


I. Background

 This case centered upon the administration of trust and estate assets of Arthur
Wilson Carothers, a former Army colonel and World War II veteran residing in Corpus
Christi. Throughout the 1990s, Carothers executed various legal documents providing that
accountant Andrew Huffmeyer would exercise control over his estate in the event of his
incapacitation or death. On January 12, 2002, Carothers was struck by a vehicle and fell
into a coma. He died on May 16, 2002.

 Shortly after Carothers became incapacitated, Huffmeyer hired Kaufman, a Harvard-educated former attorney and law professor, and other attorneys to assist him in his role
as Carothers' attorney-in-fact and as trustee of Carothers' inter vivos trust. Between
January 2002 and April 2003, while in the care of Huffmeyer and his attorneys, the corpus
of Carothers' estate was depleted by over $500,000 due to the charging of legal and other
professional fees. In April 2003, a successor trustee, Eric Anthony, was appointed to
administer Carothers' estate.

 On November 10, 2005, a Nueces County grand jury indicted Kaufman and
Huffmeyer on charges of felony theft and misapplication of fiduciary property of a value
greater than $200,000, both first-degree felony offenses. See id. § 31.03 (Vernon Supp.
2007), § 32.45. (1) Prior to trial, Huffmeyer entered into a plea agreement with the State
under which he pledged to plead guilty to the second count of the indictment and to testify
against Kaufman. In exchange, the State agreed to recommend a sentence of five years'
imprisonment for Huffmeyer. The trial proceeded against Kaufman. Testimony at the trial,
which was held before a jury from November 13 to 20, 2006, revealed the details of how
the value of Carothers' estate was depleted by over half a million dollars by Huffmeyer and
his attorneys over the course of approximately sixteen months.

A. Testimony of Cheryl Whited

 Carothers' will and trust documents were first drafted in 1992 by attorney Cheryl
Whited, who is board certified in estate planning and probate law. Whited testified that,
at the behest of Carothers, changes were made to the trust document later in 1992 and
again in 1993 and 1994. On May 17, 1995, Carothers directed Whited to completely
rewrite the will and trust documents, and to prepare a durable power of attorney. (2)

 The will named Huffmeyer as executor of the estate and Whited as alternate
executor. Under the will, Carothers bequeathed his vehicle to his friend Mary Helen
Kugler, and his furniture and other personal effects to the Salvation Army of Corpus Christi. 
The will also stated that:

 I may leave a written statement or list disposing of certain items of my
tangible personal property. Any such statement or list in existence at the
time of my death shall be determinative with respect to all items devised
therein. If no written statement or list is found and property identified by my
Executor within thirty (30) days after my Executor's qualification, it shall be
presumed that there is no such statement or list and any subsequently
discovered statement or list shall be ignored. While I understand that such
written statement or list may not be binding upon my executor, it is my wish
that such written statement or list be given effect.


 The will further provided that the remainder of the estate would pour over into
Carothers' inter vivos trust, entitled simply the "Arthur Wilson Carothers Trust." The trust
instrument provided that Carothers himself would be the initial trustee and that Huffmeyer
would be the successor trustee if Carothers became incapacitated or died. The trust was
established with specific details as to how Carothers' assets were to be distributed, and
how the trust was to be terminated, upon Carothers' death.

 The trust instrument commanded the trustee to distribute Carothers' assets upon
his death. First, his vehicle, furnishings, and personal effects were to be distributed
according to the terms of his will. The remainder of his estate was to be divided among
various family members and acquaintances of Carothers. The first $100,000 in assets was
to go to Kugler if she survived Carothers; that gift would lapse if she did not survive him. 
The second $50,000 in assets was to go to Carothers' step-granddaughter, Mary Kathleen
Kridler, if she survived Carothers, and if she did not, to her son Austin Kridler. The next
$25,000 in assets was to go to Carothers' step-daughter, Judith Margaret Vance, or to
Mary Kathleen Kridler if Vance did not survive Carothers; and the next $25,000 would go
to Carothers' step-daughter-in-law, Sandra Turner, if she survived him. Finally, $100,000
was to be distributed to the Indiana University Foundation to support a group of
scholarships. After these specific bequests, the residue and remainder of the trust corpus
was to be distributed to the United Methodist Church in Mulberry, Indiana, for the Music,
Building and Maintenance Fund, in the name and memory of Carothers' late wife, Lois Ann
Carothers.

 Additionally, the trust document provided that:


[t]he Trustee shall be entitled to receive reasonable compensation for the
services of the Trustee hereunder. The hourly rate of $65.00 to $75.00 per
hour shall be deemed to be reasonable compensation of A. F. Huffmeyer for
purposes of this Agreement. The hourly rate of $140.00 pre [sic] hour shall
be deemed to be reasonable compensation of Cheryl A. Whited for purposes
of this Agreement.


 The durable power of attorney, also signed on May 17, 1995, named Huffmeyer as
Carothers' attorney-in-fact, and named Whited as his successor upon Huffmeyer's death,
disability, resignation, or refusal to act. The durable power of attorney was effective
immediately upon its execution and it granted Huffmeyer all the powers available to an
attorney-in-fact under the Durable Power of Attorney Act. See Tex. Prob. Code Ann. §§
481-506 (Vernon 2003). (3)

 Whited testified that, upon being informed by Huffmeyer of Carothers' injury and
incapacitation, she faxed to Huffmeyer a letter composed by Carothers on May 17, 1995
and addressed to Huffmeyer. The letter contained a comprehensive seventeen-point list
of various items of information and instructions to be carried out by Huffmeyer upon
Carothers' death. The letter, remarkable in its scope and detail, included the following:


 A list of addresses and phone numbers of military agencies to notify upon
Carothers' death, including the Adjutant General's Office in Washington, D.C. and
the Defense Finance Accounting Service in Cleveland, Ohio;

 Details of Carothers' burial insurance policy with Guardian Plans, Inc., including
policy number and contact information;

 The name and contact information of the funeral home in Corpus Christi that
Carothers designated to be in charge of his burial arrangements, along with a
statement that the funeral home director also had been provided with written
instructions;

 Details of the specific plot in which Carothers planned to be interred at Fort Sam
Houston National Cemetery and the procedure to follow under which he would be
interred next to his first wife;

 A statement that Carothers wished to have a closed casket immediately upon his
death, and that he did not desire any funeral service or pall bearers;

 Carothers' Medicare account number and details of Carothers' supplemental health
insurance policy with the Retired Officers Association, including policy number and
contact information;




 A statement that Carothers, as a retired Army officer, was entitled to hospitalization
and medical care at any Army, Navy, or Air Force Hospital, if space is available,
along with Carothers' Army Identification Card number;

 A statement that Carothers, as a World War II veteran, was entitled to
hospitalization and medical care at any VA Hospital;

 A statement that, in the event of an incapacitating injury, Carothers "[did] not want
any heroic medical efforts or experiments used to prolong or sustain my life by
artificial or mechanical means" and that he "wish[ed] to be permitted to die a natural
death";

 An inventory of items in Carothers' safety deposit box at Nations Bank in Corpus
Christi, which included his insurance policies, several certificates of deposit, and
copies of his birth certificate and will;

 Details of Carothers' Merrill Lynch brokerage account and Nations Bank checking
account;

 A comprehensive inventory of documents contained in Carothers' filing cabinet at
his apartment in Corpus Christi, organized by drawer; and

 A statement that Carothers had no debts.



In short, Carothers' letter provided Huffmeyer with virtually everything he needed to know
in order to fully and efficiently administer his estate.

 Whited testified that when she drafted the various estate documents, Carothers'
assets were primarily in money market funds which are "very easy to distribute" because
they "can be converted to cash instantly." Carothers also had established several payable-on-death certificate of deposit accounts for the benefit of several different beneficiaries. 
Whited explained to the jury that money held in such an account would go directly to the
beneficiary upon the account holder's death, without going into probate. However, when
Carothers became incapacitated, Huffmeyer liquidated those payable-on-death accounts
using his power of attorney and transferred the funds to an account in the name of the
trust.

 Overall, Whited stated that "it was very clear where [Carothers] wanted things to go"
and that she "wouldn't consider it an unusually difficult estate or trust to administer by any
means." She also testified that, in her professional opinion, based on the specific
circumstances regarding Carothers' estate, the fees charged by the trustee in this case
should have been no more than $16,800, including any fees charged by the trustee's
attorney.

B. Testimony of Beneficiaries

 Also testifying for the State was Steve Nordin, Carothers' nephew. Nordin is the son
of Alma Williams, Carothers' sister and a beneficiary under a $25,000 payable-on-death
account set up by Carothers. On July 17, 2002, Nordin wrote to Huffmeyer on behalf of
his mother, inquiring as to the status of the account. Huffmeyer replied on October 29,
2002, over five months after Carothers' death, stating that "the preparation for filing letters
testamentary for the estate of Mr. Arthur W. Carothers is continuing and is almost
complete" and "it is necessary to complete the probate procedure prior to and [sic]
distributions to any Trust beneficiaries."

 Nordin testified that Carothers continued to receive his monthly pension checks from
the Army after his death, and that Nordin contacted the Army and discovered that they had
not been notified of his uncle's death. Upon learning that his uncle had left substantial
amounts of money to Indiana University and the Mulberry Methodist Church, Nordin
contacted the university and the church on September 20, 2002. Nordin testified that
neither the university nor the church were aware of Carothers' death as of the time he
contacted them. Nordin later learned that, not only did Carothers open a payable-on-death
account for the benefit of his mother, but a separate $51,000 had been deposited by
Carothers in payable-on-death accounts for his direct benefit. Neither Nordin nor Williams
ever received the funds designated for them in the payable-on-death accounts.

 The State also presented testimony by Allen Kugler, son of Carothers' friend Mary
Kugler. Allen testified that his mother received the car and money left to her by Carothers
several months after he died, and that the car and money were delivered to his mother not
by Huffmeyer but by Anthony, the successor trustee.

C. Testimony of Andrew Huffmeyer

 Huffmeyer's testimony confirmed the events recounted by Whited and the trust
beneficiaries. Huffmeyer first met Carothers in 1993; he was asked by Carothers in 1995
to serve as the executor of his estate because Carothers had no family in the area. 
Huffmeyer acknowledged that the will, trust, and power of attorney gave him the power to
act in a fiduciary capacity on behalf of Carothers, and that after Carothers died, he was to
handle the trust corpus for the benefit of the beneficiaries of the trust and the will.

 Because Huffmeyer had not previously served as a trustee or estate executor, he
believed he needed to hire an attorney to advise him. Huffmeyer explained to the jury that,
when Carothers became incapacitated, he hired Colin Kaufman and his wife, Sharon
Kaufman, whom he also believed to be an attorney. Huffmeyer also hired attorney Gene
Garcia to advise him on how to proceed. When Huffmeyer, Kaufman, and Garcia first met
together, they decided that Garcia would represent the trust and that Kaufman would
represent Carothers individually while he was in the hospital. When Carothers died,
another attorney, Vivian Cavada, was hired to represent the estate, and Kaufman came
to represent Huffmeyer as trustee. Another attorney, Stonewall Van Wie, was also hired
to do work for the estate. (4)

 According to Huffmeyer, Kaufman was substantially involved in the administration
of Carothers' estate. Huffmeyer claimed that Kaufman advised, encouraged, and directed
him on how to carry out his duties as Carothers' executor, trustee, and attorney-in-fact. 
Kaufman would periodically bill Huffmeyer for services provided by him and his wife;
Huffmeyer would then pay Kaufman by check drawn on the trust accounts. Huffmeyer
acknowledged that he was aware that the trust instrument limited the amount he could
charge for his services to $75 per hour; nevertheless, he charged $200 per hour and
Kaufman charged $400 per hour. Kaufman's wife charged $115 per hour for paralegal
work.

 Among the first acts undertaken by Huffmeyer upon learning of Carothers'
incapacity was to close the payable-on-death accounts using his power of attorney and
transfer the approximately $180,000 of funds held in those accounts to an account in the
name of the trust. Huffmeyer testified that he knew this would defeat the interests of the
beneficiaries of the accounts, yet he stated that either Kaufman or Garcia told him that
closing those accounts was "perfectly legal." On March 19, 2002, Huffmeyer wrote
Kaufman a check for $25,000 and himself a check for $20,000 out of the new trust
account. As of May 31, 2002, Huffmeyer paid Kaufman $105,000 in attorney's fees out
of the account. By September of 2002, $140,000 out of the original $180,000 taken from
the payable-on-death accounts had been paid out as professional service fees to Kaufman
and Huffmeyer. (5) Huffmeyer testified that he believed some of the money paid to Kaufman
were advances to cover legal work to be performed in the future.

 In all, Kaufman charged approximately $161,000 for various conferences with
Huffmeyer and the other attorneys, held mostly at Corpus Christi restaurants; over $7,393
to attend Carothers' funeral, which Carothers specifically stated in his letter of May 17,
1995 that he did not desire; over $88,000 for a detailed inventory of Carothers' apartment,
ostensibly to search for a "written statement or list" disposing of assets which Carothers'
will indicated might exist; over $29,000 for drafting a new trust agreement for Carothers,
even though Carothers, at the time, was incompetent to approve it; and over $94,000 for
litigation fees. Further, Huffmeyer, Kaufman, and Kaufman's wife together billed $49,702
to travel to Delaware and San Antonio to change signature cards on the payable-on-death
accounts and other bank accounts owned by Carothers.

D. Testimony of Jim Clancy and Eric Anthony

 Jim Clancy, attorney for trust beneficiary Indiana University, became aware that
Carothers bequeathed money to his client after being contacted by Nordin. (6) At trial, Clancy
testified that after repeatedly trying and failing to communicate with Huffmeyer, he filed suit
for an accounting of the estate and trust assets in district court. See Tex. Prop. Code Ann.
§ 113.151 (Vernon 2007). (7)

 Moreover, Clancy was qualified by the trial court as an expert on attorney's fees,
and he reviewed itemized bills prepared by Huffmeyer and Kaufman for their services to
the trust. Clancy testified that Kaufman and Huffmeyer's travel expenses, in particular,
were "ridiculous," as he believed it was not necessary for a trustee to appear in person at
a bank to change a signature card; and in any event, it certainly was not reasonable or
necessary for the trustee to take an attorney and paralegal with him. He also opined that
the number of conferences held by Huffmeyer and his attorneys, as well as the length and
location of those conferences, were unusual in his experience. Finally, Clancy testified that
the amounts charged for litigation with beneficiaries seeking an accounting was
unnecessary because beneficiaries were entitled to an accounting upon a simple request. 
See id.

 Huffmeyer was eventually removed as trustee by the district court in April 2003, and
attorney Eric Anthony was appointed as his successor. See id. §§ 113.082-.083 (Vernon
2007) (providing for the removal of trustee and appointment of successor trustee by the
court). A subsequent accounting revealed that between February 1, 2002, and February
28, 2003, the value of the trust assets decreased from $961,798.41 to $448,773.59, a
difference of $513,024.82. A substantial part of the decrease was due to fees charged
against the trust for professional services--Kaufman was paid a total of $285,000 out of
the trust; Huffmeyer was paid $144,321.44; Garcia was paid $30,000; and Cavada and
Van Wie were each paid $5,000. (8)

 Still, Clancy testified that the trust beneficiaries Kugler, Vance, Kridler, and the
university were paid their full distributions in December of 2003. However, the church did
not receive its full distribution. According to Clancy, had there been no wrongdoing, the
church should have received just under $500,000. Additionally, Clancy testified that had
Huffmeyer and his associates not closed the payable-on-death accounts, Kugler would
have received an additional $130,000. Anthony testified that when he took over as trustee,
eleven months after Carothers' death, most of the instructions provided by Carothers in his
May 17, 1995 letter had not been carried out. Anthony further testified that he could have
taken care of all of Carothers' estate and trust business for roughly $5,000 in fees.

E. Testimony of Colin Kaufman

 Kaufman testified in his defense, claiming first, with respect to the payable-on-death
accounts, that he advised Huffmeyer that he had the power to close those accounts but
did not advise him to actually close them. He explained that the travels to Delaware and
San Antonio were necessary because they were required by the banks; but he stated that
he could not recall why it was necessary to take a paralegal--his wife--along with them. 
He testified that he was not aware of Clancy's attempts to contact Huffmeyer until the suit
for accounting was brought. Kaufman denied padding his bills to the trust or billing the
trust for work he did not do. He denied doing work for the trust that was unreasonable or
unnecessary.

 Prior to Kaufman's testimony, the State filed a motion under Texas Rule of Evidence
404(b) to admit evidence of extraneous bad acts committed by Kaufman. See Tex. R.
Evid. 404(b). Specifically, the State sought to introduce court-certified documents showing
that Kaufman, between 1992 and 2002, had breached ethical and legal responsibilities in
his role as trustee in a bankruptcy case styled as In re Charles Feldman d/b/a Charles
Feldman Investments. In that case, Kaufman was appointed as trustee of the Feldman
bankruptcy estate in 1992 but was removed in 2001 upon a finding by the United States
Bankruptcy Court for the Southern District of Texas that he had filed insufficient
accountings, had failed to make required semi-annual disbursements required by the
bankruptcy plan, and had paid himself fees before they were earned. Kaufman was
ordered by the bankruptcy court, in a decision affirmed by the United States District Court
for the Southern District of Texas, to disgorge some $214,871.89 in attorney's fees that he
had paid himself from estate assets. Kaufman objected to the introduction of these
documents, claiming that they were inadmissible: (1) as irrelevant; (2) as character
evidence shown to prove conduct; and (3) because the case was on appeal and not final. 
The State argued that the extraneous act evidence was admissible because it was offered
not to show Kaufman's character but was probative with regard to Kaufman's intent,
knowledge, and absence of mistake. See id. The Court overruled Kaufman's objections
and admitted the documents.

 The State also offered court-certified documents showing that Kaufman had been
disbarred in the states of Texas and Kansas. The reason for the disbarments was
Kaufman's wrongdoing in the Feldman bankruptcy case. Kaufman objected to the
admission of the disbarment orders, noting that they were on appeal and not final;
however, the trial court admitted the documents.

 The trial court, applying the law of parties, instructed the jury in Section VI of the jury
charge as follows:

 Now, if you find from the evidence beyond a reasonable doubt that
Andrew Huffmeyer, in Nueces County, Texas, on or about and between
February 15, 2002 and April 25, 2003, did then and there intentionally,
knowingly or recklessly misapply property, to wit: United States Currency,
checks or money, of the value of more than $200,000, that Andrew
Huffmeyer held as a fiduciary, in a manner that involved substantial risk of
loss to . . . the owners of said property, and the persons for whose benefit
the property was held, by dealing with said property contrary to the
agreement under which the defendant held the property, to wit: by
withdrawing various amounts of money on numerous occasions during said
period of time from the said trust and from other financial accounts belonging
to said owners, for professional and fiduciary services that were not rendered
or were of little or no benefit to the said owners, and at a rate of
compensation that exceeded the amount clearly stated in the trust
agreement, and that was clearly unreasonable for the services rendered;


 And you further find that the defendant, Colin Kaufman, in Nueces
County, Texas, on or about and between February 15, 2002 and April 25,
2003, with the intent to promote, aid or assist the commission of the
misapplication of fiduciary property by Andrew Huffmeyer, did then and there
promote, aid or assist the said Andrew Huffmeyer in the commission of
misapplication of fiduciary property, then you will find the defendant "Guilty"
as a party to the offense of Misapplication of Fiduciary Property as alleged
in the indictment.


 But if you do not so believe, or if you have a reasonable doubt thereof,
you will acquit the defendant and say by your verdict "Not Guilty."


 The jury returned a verdict of guilty. After the punishment phase, the jury assessed
Kaufman's punishment at 45 years' imprisonment and a $10,000 fine. This appeal
ensued. (9)

II. Discussion

A. Sufficiency of the Evidence that Kaufman Held Property as a Fiduciary

 By his first issue, Kaufman claims that the evidence adduced at trial was legally
insufficient to prove that he held property as a fiduciary and, therefore, that he cannot be
found guilty as a principal under section 32.45 of the penal code. See Tex. Penal Code
Ann. § 32.45. (10) Kaufman's entire argument on this issue consists of the following:

Before one can be found guilty as a principal under Penal Code Section
32.45, the person must "hold property" as a fiduciary. There is no evidence
in the record of any legal document or event which caused defendant
Kaufman to hold property of another. See Section 111.004, Texas Property
Code. A trust must be in writing to be enforceable. Section 112.004, Texas
Property Code. That statute requires a trust in either real or personal
property to be created with a written document.


 Generally, in examining the legal sufficiency of evidence, we view the evidence in the
light most favorable to the prosecution to determine whether any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt. See Jackson
v. Virginia, 443 U.S. 307, 318-19 (1979); Watson v. State, 204 S.W.3d 404, 414-17 (Tex.
Crim. App. 2006). Here, however, it is unnecessary to undertake such an examination,
because Kaufman was not actually convicted as a principal under penal code section 32.45;
rather, he was convicted as a party to the offense committed by Huffmeyer. This is
permitted under the law of parties, which is codified in chapter 7 of the penal code. See
Tex. Penal Code Ann. §§ 7.01-.24 (Vernon 2003).

 Specifically, section 7.01 provides that "[a] person is criminally responsible as a party
to an offense if the offense is committed by his own conduct, by the conduct of another for
which he is criminally responsible, or by both." Id. § 7.01(a). Section 7.02 states that "[a]
person is criminally responsible for an offense committed by the conduct of another if: . .
. acting with intent to promote or assist the commission of the offense, he solicits,
encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ." 
Id. § 7.02(a)(2). Under this theory, the State is able to enlarge a defendant's criminal
responsibility to acts in which he may not be the principle actor. Goff v. State, 931 S.W.2d
537, 544 (Tex. Crim. App. 1996); Romo v. State, 568 S.W.2d 298, 300 (Tex. Crim. App.
1977); see Amaya v. State, 733 S.W.2d 168, 174 (Tex. Crim. App. 1986) (applying the law
of parties to a misapplication of fiduciary property charge). Moreover, a trial court may
charge on the law of parties even where there is no such allegation in the indictment. Goff,
931 S.W.2d at 544 n.5; Crank v. State, 761 S.W.2d 328, 352 (Tex. Crim. App. 1988); see
also Tex. Penal Code Ann. § 7.01(c) (stating that "[a]ll traditional distinctions between
accomplices and principals are abolished by this section, and each party to an offense may
be charged and convicted without alleging that he acted as a principal or accomplice.").

 It is undisputed that Huffmeyer held property as a fiduciary for Carothers and the
beneficiaries of his estate and trust. The jury charge specifically tracked the statute in
stating that, in order to return a guilty verdict, the jury must find that Kaufman "with the intent
to promote, aid or assist the commission of the misapplication of fiduciary property by
Andrew Huffmeyer, did then and there promote, aid or assist the said Andrew Huffmeyer
in the commission of misapplication of fiduciary property."

 Kaufman does not challenge the sufficiency of the evidence adduced at trial showing
that Huffmeyer "intentionally, knowingly, or recklessly misapplie[d] property he [held] as a
fiduciary . . . in a manner that involve[d] substantial risk of loss to the owner of the property
or to a person for whose benefit the property is held." See Tex. Penal Code Ann. § 32.45. 
Nor does he challenge the sufficiency of the evidence showing that Kaufman, acting with
intent to promote or assist the commission of misapplication of fiduciary property, solicited,
encouraged, directed, aided, or attempted to aid Huffmeyer in committing that offense. See
id. § 7.02(a)(2). Therefore, even if we were to agree with Kaufman that the evidence was
legally insufficient to show that he personally held property as a fiduciary, we must still
uphold his conviction as a party to the offense committed by Huffmeyer. Kaufman's first
issue is overruled.

B. Evidence of Extraneous Bad Acts

 By his second issue, Kaufman claims that the trial court erred in admitting evidence
regarding Kaufman's wrongdoing in the Feldman bankruptcy case. We review a trial court's 
ruling on the admission of evidence for abuse of discretion. Montgomery v. State, 810
S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). A trial court abuses its discretion
when its decision lies outside the zone of reasonable disagreement. Green v. State, 934
S.W.2d 92, 101-02 (Tex. Crim. App. 1996).

 Kaufman claims first that the evidence was inadmissible because the orders issued
by the Bankruptcy Court and by the United States District Court were "not final." Kaufman
asserts that the orders were, at the time, on appeal to the United States Court of Appeals
for the Fifth Circuit. Kaufman also asserts that, even if the orders were final, the bad acts
revealed in the court orders were too remote to have probative value. See Tex. R. Evid.
403 ("Although relevant, evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the
jury, or by considerations of undue delay, or needless presentation of cumulative
evidence."). (11)

 The State contends, however, that Kaufman waived these arguments by failing to
object to the admission of the disbarment orders that specifically referenced the acts of
misconduct in the Feldman bankruptcy. We agree. To preserve error in admitting
evidence, a party must make a proper objection and get a ruling on that objection. Lane v.
State, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (citing Valle v. State, 109 S.W.3d 500,
509 (Tex. Crim. App. 2003)). In addition, a party must object each time the inadmissible
evidence is offered or obtain a running objection. Id. Moreover, the admission of
inadmissible evidence can be rendered harmless if the same or similar evidence is
introduced without objection elsewhere during trial. Elder v. State, 132 S.W.3d 20, 27 (Tex.
App.-Fort Worth 2004, pet ref'd).

 Here, the State introduced as its Exhibit Number 50 a Judgment of Disbarment dated
October 4, 2004, rendered by the Honorable Robert C. Cheshire, Specially Assigned
Presiding Judge of the 214th Judicial District of Nueces County. The judgment incorporated
a jury verdict finding the following with respect to Kaufman's actions in the Feldman
bankruptcy:

Respondent Colin K. Kaufman failed to hold funds belonging in whole or in
part to clients or third parties that were in his possession in connection with
a representation, separate from his own funds.


Respondent, Colin K. Kaufman, after receiving funds in which a client or third
person had an interest, upon request by the client or third person, failed
promptly to render a full accounting regard [sic] such funds.


Respondent, Colin K. Kaufman, after receiving funds in which a client or third
person had an interest, failed promptly to deliver to the client or third person
any funds that the client or third person was entitled to receive.


Respondent, Colin K. Kaufman, charged or collected an unconscionable fee.


Respondent, Colin K. Kaufman, engaged in conduct involving dishonesty,
deceit or misrepresentation in connection with the Feldman bankruptcy
estate.


 The Judgment of Disbarment also stated that Kaufman:


shall pay restitution to the State Bar of Texas for the benefit of the bankruptcy
estate of Charles B. Feldman d/b/a Charles Feldman Investments, pending
in the United States Bankruptcy Court, Southern District of Texas, Case
Number 90-01254-B-11 in the amount of two hundred fourteen thousand
eight hundred seventy-one and 89/100 dollars ($214,871.89), pursuant to
United States Bankruptcy Court, Southern District of Texas, Corpus Christi
Division Final Judgment in said case dated March 12, 2002.


 The State also introduced as its Exhibit 51 an Order of Disbarment dated August 30,
2006, issued by the Supreme Court of Kansas. The Kansas order references the Texas
order and states that "it was found that the respondent failed to properly safeguard client
funds, failed to promptly disburse client funds, charged an unconscionable fee, and
engaged in conduct involving dishonesty, deceit, or misrepresentation in connection with
a bankruptcy client." (12)

 Although Kaufman did object to the admission of the disbarment orders at trial, he
did so solely on the basis that the orders were not final because they were on appeal at the
time. However, the record contains nothing, such as a Notice of Appeal, indicating that the
disbarment orders were on appeal. Moreover, Kaufman did not object to the admission of
the disbarment orders on the basis that they included references to extraneous offenses,
nor did he ask for a limiting instruction or that the references to the extraneous offenses be
redacted from the disbarment orders. See Tex. R. Evid. 105(a). (13) We conclude that any
error by the trial court in admitting the Feldman bankruptcy orders was cured by the later
admission, without an extraneous offense objection, of the disbarment orders which directly
referenced the misconduct committed by Kaufman in connection with the Feldman
bankruptcy. See Elder, 132 S.W.3d at 27.

 Kaufman's second issue is overruled.

III. Conclusion

 Having overruled Kaufman's two issues on appeal, we affirm the judgment of the trial
court.


 

 DORI CONTRERAS GARZA,

 Justice


Do not publish.

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and

filed this the 29th day of May, 2008.

1. Specifically, the second count of the indictment alleged that:


COLIN KAUFMAN and ANDREW HUFFMEYER, defendants, in Nueces County, Texas, on
or about and between FEBRUARY 15, 2002 and APRIL 25, 2003, did then and there
intentionally, knowingly, and recklessly misapply property, to wit: UNITED STATES
CURRENCY, checks and money, of the value of more than $200,000, that the said
defendants held as a fiduciary in a manner that involved substantial risk of loss to ARTHUR
WILSON CAROTHERS, individually and in his capacity as beneficiary of the ARTHUR
WILSON CAROTHERS TRUST, ERIC ANTHONY, in his capacity as Executor of the Estate
of Arthur Wilson Carothers, and the ARTHUR WILSON CAROTHERS TRUST, and the
successor beneficiaries of that trust, in their capacity as the heirs of the Estate of Arthur
Wilson Carothers, the owner of said property, and the persons for whose benefit the property
was held, by dealing with said property contrary to the agreement under which they held said
property, to wit: by withdrawing various amounts of money on numerous occasions during
said period of time from the said trust and from other financial accounts belonging to said
owners for professional and fiduciary services that were not rendered or were of little or no
benefit to the said owners and at a rate of compensation that exceeded the amount clearly
stated in the trust agreement and that was clearly unreasonable for the services rendered,
against the peace and dignity of the State.
2. The will, trust document, and durable power of attorney executed by Carothers on May 17, 1995
remained operative at the time of his incapacity and death. These are the documents which we will refer to
herein as the "will," "trust," and "durable power of attorney."
3. Specifically, the statutory durable power of attorney gave Huffmeyer the power to act on Carothers'
behalf in the following contexts:


(A) real property transactions;

(B) tangible personal property transactions;

(C) stock and bond transactions;

(D) commodity and option transactions;

(E) banking and other financial institution transactions;

(F) business operating transactions;

(G) insurance and annuity transactions;

(H) estate, trust, and other beneficiary transactions;

(I) claims and litigation;

(J) personal and family maintenance;

(K) benefits from social security, Medicare, Medicaid, or other governmental programs or
civil or military service;

(L) retirement plan transactions; [and]

(M) tax matters[.]


Tex. Prob. Code Ann. § 490 (Vernon 2003) (form for statutory durable power of attorney).
4. After Carothers died, Huffmeyer waited nearly six months before seeking letters testamentary, which
Kaufman told him was normal. When Huffmeyer was asked whether he "blindly rel[ied]" on Kaufman's advice
on "issues regarding the administering [of] the estate and seeking letters [testamentary]," Huffmeyer
responded in the affirmative.
5. When the probate was pending, Huffmeyer filed an application requesting that the probate court
authorize the estate to pay money to the payable-on-death account beneficiaries. One of the trust
beneficiaries objected to that request, and the court eventually denied that request.
6. Clancy was later also retained by the Mulberry Methodist Church, another trust beneficiary.
7. Section 113.151(a) of the Texas Property Code provides in relevant part the following:


A beneficiary by written demand may request the trustee to deliver to each beneficiary of the
trust a written statement of accounts covering all transactions since the last accounting or
since the creation of the trust, whichever is later. If the trustee fails or refuses to deliver the
statement on or before the 90th day after the date the trustee receives the demand or after
a longer period ordered by a court, any beneficiary of the trust may file suit to compel the
trustee to deliver the statement to all beneficiaries of the trust.


Tex. Prop. Code Ann. § 113.151(a) (Vernon 2007).
8. The State introduced a "Summary of Fee Bills" into evidence which summarized the charges made
by Huffmeyer and his associates to the estate and trust. In all, $597,687.50 in professional service fees were
deducted from trust accounts; this included $104,634 for "Cataloguing and reviewing every document in Mr.
Carothers' [a]partment," $261,704.50 for "Conferences between Huffmeyer and his lawyers usually at
restaurants," and $94,107 for "Litigation with the beneficiaries resisting accounting."
9. We note that, although he had previously filed a brief prepared by counsel, Kaufman subsequently
filed a pro se supplemental brief on October 26, 2007. He did this despite this Court's denial of his "Original
Motion to File a Pro Se Brief" on October 1, 2007. We will consider only the points raised in his original brief. 
See Tex. R. App. P. 38.1(e) (stating that the appellate brief "must state concisely all issues or points presented
for review."); see also Marshall v. State, 210 S.W.3d 618, 620 n.1 (Tex. Crim. App. 2006) (stating that a
criminal defendant does not have a right to hybrid representation), cert. denied, 2007 U.S. LEXIS 9543 (U.S.
Oct. 1, 2007).
10. Texas Penal Code section 32.45 states that:


A person commits an offense if he intentionally, knowingly, or recklessly misapplies property
he holds as a fiduciary or property of a financial institution in a manner that involves
substantial risk of loss to the owner of the property or to a person for whose benefit the
property is held.


Tex. Penal Code Ann. § 32.45(b) (Vernon Supp. 2007).
11. Generally, evidence of extraneous bad acts is inadmissible if it does not have relevance apart from
character conformity. Tex. R. Evid. 404(b); see Casey v. State, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). 
However, such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absense of mistake or accident. Tex. R. Evid. 404(b); see Johnston
v. State, 145 S.W.3d 215, 219 (Tex. Crim. App. 2004).
12. At trial, Kaufman was asked by the State's attorney whether the basis for the judgments of
disbarment was "the proceedings that happened in the Feldman bankruptcy." Feldman responded, "that's
the formal basis for the actions taken."
13. Texas Rule of Evidence 105(a) provides:


When evidence which is admissible as to one party or for one purpose but not admissible as
to another party or for another purpose is admitted, the court, upon request, shall restrict the
evidence to its proper scope and instruct the jury accordingly; but, in the absence of such
request the court's action in admitting such evidence without limitation shall not be a ground
for complaint on appeal.


Tex. R. Evid. 105(a).