**Robert AMAYA and Fernando Hernandez, Appellants,**

v.

**STATE of Texas, Appellee.**

**No. 304–84.**

Court of Criminal Appeals of Texas, En Banc.

July 2, 1986.

---

Andrew J. Forsythe, Austin, for Amaya.

Ian Inglis, Austin, for Hernandez.

Ronald Earle, Dist. Atty., and Terrence Keel, Asst. Dist. Atty., Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANTS' PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

Robert Amaya and Fernando Hernandez, along with Omero Luna, Arturo Casillas and Jose Aguilar, were convicted by a jury for the offense of misapplication of fiduciary property in an amount exceeding $10,-000. See V.T.C.A. Penal Code, § 32.45. The jury assessed Amaya's punishment at ten years confinement in the Texas Department of Corrections and a $10,000 fine; Hernandez and the other three individuals each were assessed confinement for twelve years and one day in the Texas Department of Corrections and a $10,000 fine. The five men were tried jointly, and their appeals were jointly submitted to the Austin Court of Appeals. That court affirmed the judgments of conviction in an unpublished opinion. *Casillas, et al.* (Tex.App.—Austin, Nos. 3–82–216–CR(T)—3–82–220–CR(T), delivered Nov. 30, 1983). We granted appellants' petitions for discretionary review to examine the Court of Appeals' holdings: (a) that the evidence was sufficient to support the convictions; and (b) that the trial court's refusal to submit requested limiting charges concerning the existence of a conspiracy and the co-conspirator exception to the hearsay rule was not error. We have divided the joint appeals into two decisions from this Court, with the other opinion affirming the convictions of Casillas, Luna and Aguilar. See *Casillas et al.*, 733 S.W.2d 158 (Tex.Cr.App.1986). In this opinion we reverse the convictions of Amaya and Hernandez for insufficiency of the evidence, and enter a judgment of acquittal.

The facts of this case are rather complex, involving many characters and numerous acronyms. In 1969 the Mexican American Council for Economic Progress (MACEP) was formed as an anti-poverty, non-profit organization in Austin, Texas. In 1973, MACEP prepared and submitted to the Office of Economic Opportunity (OEO) a grant proposal, pursuant to which MACEP received a $419,000 grant for the economic development of migrant and other season-

ally employed farmworkers under Title IIIB of the Economic Opportunity Act of 1964, 42 U.S.C.A. §§ 2861 et seq., repealed, 42 U.S.C.A. § 9912 (West 1983).

Of the $419,000 grant, $150,000 was originally designated to establish an equity loan fund, for purposes of lending "seed" money to farmworkers who wanted to start their own businesses. Rather than establishing the originally proposed loan fund, it was decided by the OEO representative, at the suggestion of Casillas and another MACEP representative, Mr. Harmon Lisnow, to establish a Minority Enterprise Small Business Investment Corporation (MESBIC), to be licensed and regulated by the Small Business Administration (SBA). The MESBIC was named Tejas Investment Corporation (Tejas), and was licensed on January 24, 1975. The $150,000 was adjusted to $155,000, which MACEP used to purchase 51% of the voting stock in Tejas.

Establishing the MESBIC under SBA regulations required private matching funds of $150,000, which took some time for MACEP to accumulate. Because of the delay, the MESBIC was unable to get its SBA license during the original grant period between June 1, 1973 and May 31, 1974. Therefore a second grant of $350,000 was made to MACEP for the period from June 1, 1974 and May 31, 1975. Meanwhile the OEO was absorbed into the Department of Labor (DOL) in 1973, making DOL the grantor agency of government.

Casillas was involved in securing the original grant for MACEP, in his capacity as president of MACEP. Aguilar was vice-president at that time, and Luna was vice-president at a later time. Appellant Hernandez was MACEP's bookkeeper. Appellant Amaya was initially a MACEP employee and later became director of the Austin Minority Economic Development Corporation (AMEDC), an organization with informal ties to MACEP.

In September of 1975, with MACEP owning and voting its controlling 51% interest in Tejas, a new board of directors was elected for Tejas. The board consisted of all five appellants and one other person, Minnie Briones. At that point Aguilar, Luna and Casillas were also directors of NACEP, and voted NACEP's controlling votes in Tejas; Aguilar was also an officer of MACEP. The new Tejas board of directors responded to a critical withdrawal of private funds by deciding to surrender their MESBIC license, reorganize Tejas into a private investment corporation, and create an additional corporation called Perceptions, Inc. The new Tejas transferred $106,000 to Perceptions, Inc., which in turn made unsecured loans with this money to the individual appellants, who started or purchased their own businesses.

In reviewing the sufficiency of the evidence to support a criminal conviction, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Anderson v. State,* 701 S.W.2d 868 (Tex.Cr.App.1985).

Appellants challenge the sufficiency of the evidence to show a misapplication of fiduciary property under V.T.C.A. Penal Code, § 32.45, which provides:

"(a) For purposes of this section:

(1) 'Fiduciary' includes:

(A) trustee, guardian, administrator, executor, conservator, and receiver;

(B) any other person acting in a fiduciary capacity, but not a commercial bailee; and

(C) an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary.

(2) 'Misapply' means deal with property contrary to:

(A) an agreement under which the fiduciary holds the property; or

(B) a law prescribing the custody or disposition of the property.

(b) A person commits an offense if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary or property of a financial institution in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held."

Appellant Amaya argues that the evidence failed to show that he acted as a party to the offense because he lacked the intent to promote or assist the commission of the offense. Amaya attacks the failure to prove that his acts, as president of Perceptions, Inc., were accompanied by knowledge of the agreement under which the fiduciary funds were held or knowledge that the source of the funds emanated from the DOL grant. The evidence only showed that Amaya once worked for MACEP, he knew and had contact with those who knew about the grant and its provisions, he was a board member of Tejas until he was asked to resign, and he served as president of Perceptions, Inc. He argues that, because his knowledge was not shown, his intent to assist in the commission of an offense was not demonstrated.

In the early stages of MACEP, Amaya was an employee, then became the Director of its Business Development Section. That function was subsequently separated from MACEP and reincorporated into the Austin Minority Economic Development Corporation, AMEDC, with Amaya still the director. MACEP and AMEDC had a strong working relationship, but no funding connection, according to Amaya. He also served on the Board of Directors of Tejas from approximately January, 1975 to September, 1975.

Amaya relies on his ostensibly tenuous connection with MACEP, and his own direct testimony, to demonstrate that he was not familiar with MACEP's agreement covering the use of the funds. Referring back to § 32.45, however, we observe that the breach of an agreement is not the only possible avenue for commission of the offense of misapplication. An actor can also "misapply" by dealing with property contrary to "a law prescribing the custody or

disposition of the property," under 32.-45(a)(2)(B), supra.

At trial, the State approached the misapplication issue by both available avenues, with evidence of the MACEP grant agreement as well as evidence of two laws that were allegedly violated by appellants.[1] The Court of Appeals found that the evidence was sufficient to show that the funds were dealt with contrary to the terms of the government grant. We agree with Amaya that the record does not demonstrate that he had knowledge of the provisions in the agreement; Hernandez's knowledge was also not demonstrated although such knowledge is circumstantially shown for the other three appellants.

The State argues to this Court, and we agree, that the most cogent theory for misapplication is that appellants violated the applicable conflicts of interest regulation governing SBA licensees, 13 CFR 107.1004 (1975). The regulation was discussed by a State's witness, and a copy of it was in evidence for the jury. It provides, in part:

"A Licensee shall not, directly or indirectly, provide Financing to any of its Associates."

Amaya and Hernandez, as well as the other three, argue that this restriction ceased to apply after they unilaterally decided to revoke their SBA license on September 26, 1975. We find from the evidence that the license was not in fact surrendered until November 7, 1975, when the SBA officially agreed to the attempted unilateral revocation. (Our reasoning on this issue is detailed in the companion opinion, slip op. pp. 5–7.)

In the time between the September 26 meeting and the eventual license surrender, events occurred in furtherance of the mutual plan to channel funds from Tejas into the "holding company" (Perceptions,

---

1. The second law advanced by the State at trial is Art. 2.41A(4), Tex.Bus.Corp.Act (Vernon's 1986), which imposes joint and several liability upon directors of a corporation who vote for or assent to the making of a loan to an officer or director. We note that this law imposes only limited civil liability, of directors to the corporation until the loan is repaid, and is not a law "prescribing the custody or disposition of the property" as contemplated by V.T.C.A. Penal Code, § 32.45, supra. Examples of laws which do fit § 32.45, supra, are the duties imposed on trustees by the Texas Trust Code, §§ 113.051–113.055 (Vernon's 1984). For example, § 113.-052 states, in part: "Except as provided by Subsection (b) of this section, a trustee may not lend trust funds to ... the trustee or an affiliate; ...."

Inc.), and then to appellants' own businesses. On October 23, Perceptions was incorporated, and Amaya and Hernandez were installed as officers of it (while Casillas, Luna and Aguilar remained directors of Tejas, which effectively controlled Perceptions). On October 27 the first installment of capitalization, a check from Tejas for $50,000, was made to Perceptions. State's witness Gene Mendez testified that during the same period in October, he participated in at least two meetings attended by all five appellants where disposition of the Tejas/Perceptions capital was discussed. Types of business ventures for the individual appellants were discussed, as was a division of the available money into amounts of approximately $17,500 for each investment. Testimony by each appellant confirmed these discussions in October. On October 31, $17,000 was paid from Tejas (by a check signed by Luna and Casillas) to the Oak City Inn, a restaurant owned by Luna. On November 1, notes for $18,500 apiece were executed by Hernandez and Aguilar, in favor of Tejas, for loans for investment in a restaurant called La Copa de Leche which was incorporated on November 7, 1975. Finally, on November 7, a check for $34,000 was written from Perceptions (signed by Amaya and Hernandez) to La Copa de Leche.

After November 7, the arrangement continued, with another $56,000 loaned by Tejas to Perceptions on November 20. Loans to the appellants continued: Taco Village, a restaurant owned by Amaya and Casillas, received $37,000 from Perceptions beginning November 19; and Oak City Inn received $18,500 from Perceptions on November 24. On January 7, 1976, the Tejas shareholders met and decided that Perceptions was not working out as anticipated and should be abandoned.

The evidence thus shows that sometime between September 26, 1975 and November 7, 1975, the five men agreed to set up a corporation, capitalize it with funds from Tejas, and divide up the funds approximately equally among themselves in the form of loans to businesses they would own. Prior to November 7, the SBA conflicts of interest regulation was in force and prohibited the course of conduct engaged in by appellants.

We conclude, in our analysis to this point, that Amaya and Hernandez are subject to the conflicts of interest regulation discussed above, 13 CFR 107.1004, which remained in effect until November 7, 1975, contrary to Amaya's and the other appellants' contention. Amaya may be able to escape sanction for his mistake of fact (ignorance of the agreement's provisions), see V.T.C.A. Penal Code, § 8.02(a), but cannot be relieved of responsibility for his mistake of law (ignorance of the conflicts of interest regulation). See V.T.C.A. Penal Code, § 8.03(a).

The evidence, including Amaya's own testimony and his grand jury testimony that was read before the jury, showed that he knew that the money invested in Perceptions was from Tejas, and only from Tejas. He was on the board of Tejas and attended the September 26, 1975 meeting where the decisions were made to revoke the MESBIC license, reorganize Tejas and turn it into a private investment company with no license, using remaining MACEP funds to finance minority entrepreneurs. He was president of Perceptions when Tejas infused $50,000 into Perceptions on October 27, 1975. His grand jury testimony, read to the jury, included his calculation of the amount Tejas put into Perception as "approximately 17,500 times five," for the five appellants. He admitted that he participated in some of the October discussions of what do with the Tejas/MACEP money, and that although he had the authority to sign checks for Perceptions, he deferred to decisions of the majority of the group of appellants in deciding who to lend the money to. (Although he was unable to recall why he was chosen to incorporate and preside over Perceptions, he did remember that Luna, Casillas and Aguilar shared responsibility for deciding who got the money, even though they were neither officers nor directors of Perceptions.) His signature appeared on a November 7, 1975 check for $34,000 from Perceptions to La Copa de Leche. Finally, he testified that his responsibility as president of Perceptions

ended when Perceptions ended, and that Tejas was then the holder of the notes. Hernandez is similarly situated except that he was a lesser officer in Perceptions.

We believe that the evidence amply shows Amaya's and Hernandez's awareness of the source of the money and their active participation in the disposition of the money. They are charged, just as the other appellants, with knowledge of the legal restrictions imposed on use of the money. The jury was adequately instructed on the defenses of mistake of fact and mistake of law, and on the definition of "intentionally." We conclude that, if Amaya and Hernandez could be treated as primary actors in the offense,[2] their convictions should be affirmed.

Amaya and Hernandez argued at trial that their fiduciary relationships with regard to Tejas ended as of their resignations (at the request of Luna) from the board, within a week after the September 26, 1975 meeting. Although this specific argument is not presented to this Court, we consider it under our authority to consider sufficiency of the evidence issues, and because it relates intimately to the arguments discussed above. If successful, this argument relieves Hernandez also of criminal liability, because he resigned at approximately the same time.

Hernandez and Amaya raised this issue to the Court of Appeals, which held the evidence sufficient to show that both were on the Tejas board at the time of reorganization *and at the time the decisions to form Perceptions and lend the money to themselves were made.* Further, the court held that both were officers of Perceptions

when funds were transferred from Tejas to Perceptions. Finally, the court noted that the trial court charged the jury on the law of parties, and that Hernandez and Amaya aided the other appellants by serving on Perceptions and assisting in the misapplication. *Casillas,* supra at slip op. p. 5.

■ We agree with this analysis, except that it is *not* shown by the evidence that either appellant was on the Tejas board when the decisions to form Perceptions and lend the money to themselves were made. Amaya testified that he resigned within one to three weeks after the September 26 meeting, and then went to visit the Tejas offices while meetings happened to be going on about what to do with MACEP and Tejas. He was invited to participate, and agreed. He also testified that Perceptions was formed not very long after the September 26 meeting, but that he did not know how long, and that the decision to form Perceptions did not take place at the September 26 meeting. Hernandez testified that he resigned after the September 26 meeting, that he participated in subsequent discussions about Tejas as an accountant-advisor rather than as an officer or director, and that he was not in a fiduciary capacity with Tejas when he borrowed money for La Copa de Leche on November 1.

We conclude that Amaya and Hernandez were not shown to be in a fiduciary capacity vis-a-vis Tejas, the owner of the property, at the time they took part in the transactions.[3] This conclusion is critical to our decision because it dictates that they were not primary actors in the commission of the offense. Their convictions thus rest on the

---

**2.** Our nomenclature from this point on demands explanation, due to the change in Penal Code treatment of the law of complicity, see V.T.C.A. Penal Code, § 7.01, and our own peculiar usage of custom. We use "primary actor" to denote one who would have been called a "principal" at common law, and "party" to denote an one who would have been an "accomplice" at common law. We recognize that § 7.01 uses "parties" more broadly, to include all those who are criminally responsible, and that "primary actor" is not mentioned at all. Our usage does not resurrect the common law concepts, it merely aids in the discussion where

various actors are treated under different theories of complicity.

**3.** The State argues that Amaya and Hernandez were fiduciaries under the SBA regulations, which include a provision that extends the fiduciary obligation of relevant actors for a period of six months. See 13 CFR 107.3(g) (1975). This theory would clearly work, but it is not one that was presented to the jury, which had no indication of such a provision. We cannot sustain convictions upon theories that were not before the jury and are not in the record. See, e.g., *Jones v. State,* 478 S.W.2d 937 (Tex.Cr.App. 1972).

law of parties, which we find is insufficient to affirm their convictions.

■ The applicable law (which the jury was charged on), V.T.C.A. Penal Code, § 7.02(a)(2), states:

"A person is criminally responsible for *an* offense committed by the conduct of another if ... *acting with intent to promote or assist the commission of the offense,* he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." (Emphasis added.)

While Amaya and Hernandez, just as the other appellants, are charged with knowledge of the law as primary actors, we cannot hold them accountable as parties without some indication that they knew they were assisting in the commission of an *offense.* Otherwise, criminal complicity would extend to all those who perform acts that happen to assist in a criminal undertaking, even though there was no knowledge that a crime was being assisted. We require a higher level of complicity from those we denote parties than those we denote primary actors, because the former are performing acts that are not illegal in and of themselves; the acts only attract criminal liability because of the result they are directed to, the commission of a crime. The conduct of primary actors is a crime in and of itself, and we hold such actors liable whether they realize they are breaking the law or not.

This distinction has not been directly made by this Court, to our knowledge.[4] Perhaps one reason is that most Penal Code offenses involve conduct that is inher-

ently "criminal" in nature. Conduct that is proscribed variously by § 19.02 (murder), § 20.03 (kidnapping), § 22.01 (assault), § 22.011 (sexual assault), § 22.07 (terroristic threat), § 25.02 (incest), § 28.02 (arson), § 29.02 (robbery), § 30.05 (criminal trespass), § 31.03 (theft), § 32.21 (forgery), § 36.02 (bribery), § 37.03 (perjury), § 38.03 (resisting arrest), § 38.07 (escape), § 42.02 (riot), § 42.11 (cruelty to animals), etc. throughout the Penal Code, is conduct that *by its very nature* supplies proof of the parties' knowledge that the conduct is "criminal." As such, defenses to culpability under the law of parties tend to focus on ignorance of the *conduct* sought to be aided.[5] Here, the defense centers not on ignorance of the conduct (the dispersal of MACEP funds to fiduciaries), but rather on ignorance that the conduct constituted an offense, because the conduct prohibited is not inherently criminal. Disbursing money to a corporation's own directors is not unheard of (see Footnote 1, supra, discussing Tex.Bus.Corp.Act § 2.41A), and lending seed money to beginning businesses is the legitimate conduct that appellants initially set out to accomplish. It becomes criminal under § 32.45, supra, only when money is applied contrary to an applicable law or agreement.

As we have stated in the language of cases such as *Bush v. State,* 506 S.W.2d 603, 605 (Tex.Cr.App.1974):

"When A actually commits the offense, but B is present, *knowing the unlawful intent,* and aids by acts or encourages

---

**4.** But see *William Sommerville & Son, Inc. v. Carter,* 571 S.W.2d 953 (Tex.Civ.App.—Tyler 1978, affirmed), where the court found that, to be an aider and abettor under Art. 911b, § 16(a) Tex.Rev.Civ.Stat.Ann. (1925), one must have knowledge of the illegality alleged plus criminal intent to violate and must actively encourage the principal actor in the violation. The Supreme Court of Texas affirmed using different reasoning (that a violation of § 16(a) does not constitute negligence per se), and specifically did not reach the lower court's reasoning on this point, stating, "[s]uffice it to say ... that our opinion should not be read as approving the court of civil appeals on this point, nor should that portion of the court of civil appeals [sic] opinion relating thereto carry any precedential

weight when the issue is raised in the context suggested by the Attorney General." *Carter v. William Sommerville and Son, Inc.,* 584 S.W.2d 274 (Tex.1979), at 279, n. 4.

**5.** See, e.g., *Davis v. State,* 651 S.W.2d 787, 792 (Tex.Cr.App.1983), where we held that no harm was shown by the refusal of appellant's requested charge that the jury find he "knew of the intent of [the primary actor], if any there was, to rob the said [victim] of her money." The court's given charge tracked the language of the Penal Code, §§ 7.01–7.02, supra, and we held that the refused charge was adequately covered by that charge.

by words, then B is a principal." (Emphasis added.)

For further support, we note the analogous situation of an agent's responsibility for his own acts: "an agent or employee who aids or acts under the order of his employer, without knowledge of the latter's criminal intent, is not guilty of the offense." See 18 Tex.Jur.3d § 147 (1982), and cases cited therein at note 80.

We find that the State failed to show that Amaya and Hernandez were fiduciaries as to Tejas so as to be guilty as primary actors, and further that the State failed to show that either appellant knew the criminality of the conduct they assisted, sufficiently to show that they acted with intent to promote or assist in the commission of an offense as required by § 7.02. While they were clearly embroiled in the scheme, we thus are constrained to hold that a rational juror could not have found a violation by them of § 32.45 beyond a reasonable doubt. The decision of the Court of Appeals as to appellants Amaya and Hernandez is reversed, and a judgment of acquittal as to those appellants is entered. See *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey*, 437 U.S.19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). Because of this disposition we do not reach the second ground of error, which is discussed in the companion opinion.

ONION, P.J., not participating.

TEAGUE, J., concurs in the result.

CLINTON, McCORMICK and WHITE, JJ., dissent.