**Opinion issued November 17, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00957-CR

————————————

**RICHARD RENE RIVERA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1404642**

---

# O P I N I O N

A jury convicted appellant, Richard Rene Rivera, of the third-degree felony offense of racing without a license.[1] The trial court assessed his punishment at two

---

[1]  *See* TEX. REV. CIV. STAT. ANN. art. 179e, § 14.16 (West Supp. 2016).

years' confinement, suspended for two years, and a $2,000 fine. In eleven issues on appeal, appellant contends: (1) the State failed to present sufficient evidence that he conducted a horse race without a license as alleged in the indictment; (2)–(3) the trial court erroneously allowed two police officers to testify that, in their opinion, appellant was guilty of helping to conduct a horse race; (4)–(6) the trial court erroneously allowed the State to introduce evidence that appellant's wife committed the extraneous offense of impersonating a police officer because the evidence was irrelevant, unduly prejudicial, and constituted improper character evidence; (7)–(9) the trial court erroneously allowed the State to introduce evidence that appellant's wife committed the extraneous offense of being a party to an illegal bet because the evidence was irrelevant, unduly prejudicial, and constituted improper character evidence; (10) the trial court erroneously admitted testimony of statements made to another security officer because the statements were irrelevant and made outside of appellant's presence; and (11) the trial court erroneously included an instruction on law of parties in the jury charge.

We reverse and render a judgment of acquittal.

## Background

This case grew out of an investigation of a racetrack in Crosby, Texas, for a violation of the Texas Racing Act.

2

Appellant was a Department of Public Safety ("DPS") trooper and the coordinator of outside jobs for the DPS. In 2008, he began working an extra job providing security at the El Herradero Ranch in Crosby. In 2013, the owners of the ranch added a racetrack to the property. In early 2013, Agent J. Duck, with the Criminal Investigation Division of DPS, began investigating the racetrack to determine whether illegal betting on horse races was occurring at this property. In 2014, appellant was indicted, tried, convicted, and sentenced under the Texas Racing Act for conducting a horse race without a racetrack license when he knew or should have known that another person was betting on the final outcome of the race.

Agent Duck testified that, in early 2013, he and the Criminal Investigation Division of DPS began investigating the racetrack that had been added at the El Herradero Ranch to determine whether illegal betting on horse races was occurring at this property. He testified that, under the Texas Racing Act, betting on the outcome of horse races may only occur at racetracks that are licensed by the Texas Racing Commission and may only occur between the patron and the racetrack itself, but may not occur between patrons. The racetrack at the El Herradero Ranch was not licensed by the Texas Racing Commission.

Agent Duck sent Investigator Garcia and Agent J. Aguillera to El Herradero Ranch undercover as patrons on approximately eight different dates throughout 2013, beginning on February 23, 2013, to record what they witnessed using both

3

audio and video equipment. Agent Duck instructed the agents to discover "who was running things inside the racetrack," to determine if betting was occurring, and to determine if the individuals in charge of the racetrack knew that betting was occurring. The property had a parking area, an area for concession stands, a DJ, an elevated area for photo-finish cameras, starting gates, a straight-line dirt track, and fences, along which the patrons would stand to watch the races.

El Herradero Ranch personnel handed out schedules of the races that occurred each day and that said, in both English and Spanish, "gambling prohibited." Signs located throughout the property also said "gambling prohibited." Agent Duck testified that, despite these signs, "it was blatantly obvious once we got in there that gambling was going on." Agent Duck testified that the El Herradero Ranch made money by charging a $20 entrance fee, by selling alcohol and food at a concession stand, and by selling "photo finishes and winner circle photographs [and] DVD's as well."

Agent Duck agreed with the State that his investigation uncovered no evidence that the racetrack or the owners of the track were taking bets from patrons. If that was occurring, Agent Duck agreed that it was not happening "out in the open." Agent Duck testified that betting among patrons, however, did occur "out in the open." He stated:

> The way that the bets would take place was everyone would line up along the rail of [the] racetrack before the race. The horses would walk

4

by with other horses and riders. As the horses are walking by and everyone is getting a look at them, it would just be people betting back and forth to one another. They would be asking, [']I like the one on this side or the one [on] that side[,'] determining a particular horse. They would also state which amount they would like to bet.

When he viewed the videos from the undercover agents, Agent Duck was able to witness betting occurring between patrons.

Agent Duck testified that on the first day he sent officers undercover to the El Herradero Ranch, February 23, 2013, the officers witnessed appellant, a DPS Trooper, working an extra job as the head of security at the property. Appellant was present at the track on six of the eight days that the agents conducted undercover surveillance. Appellant wore his DPS uniform while he was at the property, and it was "obvious" that he was not there as a patron. Agent Duck testified that appellant "was working at the racetrack, showing a command presence. He would pull a rope across the racetrack and allow patrons to pass. He would check people and make sure they weren't bringing in beer from outside since they sold beer there." Agent Duck stated that other police officers were at the property working security, as well as "an individual there who was dressed as a police officer and impersonating [but who] was not a police officer." Agent Duck identified this individual as Consuela Rivera, appellant's wife.[2] Appellant objected to this testimony on relevance

---

[2] The undercover officers testified that, on various occasions, Consuela Rivera wore either a peace officer's uniform with a state seal or a shirt that had her name and

5

grounds, Rule 403 grounds, and Rule 404(b) grounds. The trial court overruled these objections and allowed Agent Duck to testify that Consuela Rivera, who was not a police officer, wore an officer's uniform while working security at the property.

Agent Duck testified that "[i]t was apparent that Mr. Rivera was in charge" of the other officers at the property and that appellant would coordinate the officers' schedules. He also stated that police officers working extra jobs "still enforce the laws" and "still provide a command presence." If an officer sees a crime occur while he is working an extra job, he is "bound to act on that appropriately and make the arrest or whatever action needs to be taken."

On re-direct examination, the State asked Agent Duck about the types of actions appellant performed in providing security at the El Herradero Ranch. Agent Duck testified that officers observed appellant "pulling [a] rope across the track," and he clarified that, in between the races, patrons were allowed to walk around the property and appellant "would pull the rope across the track to allow patrons to get across safely without having a run in with one of the horses."

Agent Duck and the State had the following exchange:

| [The State]: | So were there times when [appellant] allowed people to walk and times when he stopped people from walking on the track? |
|---|---|
| [Agent Duck]: | Yes, ma'am. |

patches and that identified her as a police officer. Appellant testified that Consuela "wore a generic uniform" and carried a firearm.

6

| [The State]: | Did that aid in the racing? |
|---|---|
| [Agent Duck]: | Yes, ma'am. |
| [Defense counsel]: | Your Honor, that's a legal determination by the jury, invading the province of the jury. |
| The Court: | Overruled, Counsel. |

Agent Duck also testified that appellant wore either his full DPS uniform or a safety vest that stated "Police," and he would ride around the property on a four-wheeled ATV to "check out different locations of the track."

Agent Aguillera testified that he went undercover as a patron at El Herradero Ranch on approximately five occasions, equipped with an audio and video recorder. He agreed with the State that gambling was occurring at the races. He testified that "[p]rior to the races, we would have people come up and ask us ['W]hich horse do you want? Which side do you want?[']" and that the patrons were not whispering or trying to hide what they were doing. After the races, Agent Aguillera witnessed the open exchange of money between patrons depending on the outcome of the race. Agent Aguillera was repeatedly approached by patrons asking him if he wanted to place a bet. Agent Aguillera witnessed patrons betting on the races each time he visited the El Herradero Ranch.

Agent Aguillera testified that appellant would spend some time on a four-wheeler driving around the property and that at other times he would be walking through the crowd or on the track. Agent Aguillera agreed with the State that there

were times when appellant "was present in a crowd of people and betting would be taking place" and that appellant was occasionally "nearby when the gambling was going on." At one point, appellant was standing approximately thirty yards away from two patrons exchanging money after a race. Agent Aguillera testified that it was possible that that transaction could have been visible to appellant. On other occasions, patrons engaged in gambling and discussing gambling were ten or fifteen feet away from appellant.

On October 5, 2013, Agent Aguillera again visited the racetrack. On this occasion, he had a conversation with appellant that was recorded. Appellant had left the parking area and was walking toward the concession stand, and Agent Aguillara asked him a couple of questions, including whether it was okay for him as patron to make a bet on a race. Appellant replied "yes as long as he didn't see it" because he "couldn't take enforcement action upon" bets that he did not witness. Agent Aguillera witnessed gambling every time he visited the racetrack and it always occurred in the open.

The trial court admitted video recordings that Agent Aguillera made while undercover at the property. One clip depicted the conversation Agent Aguillera had with appellant on October 5, 2013, regarding whether betting was allowed. Other clips showed appellant and other security officers, in uniform, walking on the track, around the property, and through the crowd. In one video, taken on March 30, 2013,

appellant can be seen sitting on an ATV near the track after a race had occurred. Within the next two minutes, three different payouts for bets occurred while appellant sat on the ATV approximately thirty to fifty feet away. It's unclear from the video whether those payouts occurred within appellant's line of sight. On cross-examination, Agent Aguillera acknowledged that he could not see any patrons gambling right in front of appellant and that appellant was not "in the middle" of betting as it was occurring.

Investigator Garcia, a lieutenant with the Brookshire Police Department assigned to work with DPS, first went to El Herradero Ranch on February 23, 2013. He immediately witnessed patrons betting, and he testified that some individuals "were actually walking around asking if somebody wanted to take a bet." He testified:

> It was open. It was out in the open. You just go up there and people start asking which horse you want. They start asking you want this horse or that horse type deal. Trying to engage in betting as soon as you walk up. It's just open betting.

The State and Investigator Garcia had the following exchange:

| [The State]: | As part of your undercover role, was it to determine who was helping conduct this racetrack? |
|---|---|
| [Investigator Garcia]: | Our deal is trying to find who was conducting it and to document that in fact it was going on. |

9

| [The State]: | Were there other people that, you, throughout the investigation were able to identify as helping run the track? |
| --- | --- |
| [Investigator Garcia]: | Yes, ma'am. There were property owners and probably about six other officers. |
| [Defense counsel]: | Your Honor, we object to helping run the track as being a legal conclusion and invading [the] province of the jury. |
| The Court: | Overruled. |

The trial court also admitted video recordings made by Investigator Garcia while undercover. In one clip, taken on an unknown date, three different payouts occurred among patrons standing near the fence running along the racetrack. While this occurred, appellant stood on the track, approximately twenty to thirty feet away, with his back to the patrons. He later turned towards the patrons, but the video did not show any further betting among patrons occurring at this time. The trial court admitted another video in which patrons were "celebrating" over a race that had just occurred while appellant was standing nearby. Investigator Garcia agreed that "at this time, at this location," he saw betting occurring.

Investigator Garcia also testified that, on one occasion, he approached Consuela Rivera, who was wearing a shirt that identified her as a police officer, and spoke with her. Investigator Garcia "asked her about the horses, which one would be a good one to bet on." Defense counsel objected on relevancy, Rule 403, and Rule 404(b) grounds. The trial court overruled the objections. Investigator Garcia

10

testified that his conversation with Consuela Rivera was amicable and that, after their conversation, he made a bet on the next race with a patron. The trial court admitted an audio recording of this conversation. Investigator Garcia won $100, and he "paid Ms. Rivera for information" and "told her it was payoff for the tip she had given [him]." Consuela Rivera took the money from Investigator Garcia and "was happy about it."

Investigator Garcia also testified concerning a conversation that he had with another person working security, Officer G. Hurd. Defense counsel objected to the State's line of questioning on relevancy grounds, and the trial court overruled the objection. Investigator Garcia testified that he told Officer Hurd, "[I]f I won, based on the information he gave me, I would give him some money. Or if he ever wanted to make a bet to let me know, and I would bet for him." Officer Hurd did not escort Investigator Garcia off the property or write him a ticket, and Garcia was able to continue betting on that occasion. On cross-examination, Investigator Garcia testified that appellant was not present at the time Garcia had this conversation with Officer Hurd.

Investigator Garcia testified that he never spoke with appellant, but, on one occasion while appellant was standing nearby, he got into an argument with another patron concerning whether a race had actually occurred and whether the other person was going to pay Garcia. One of the property owners, Reginald Mandujano, was

called over to mediate the dispute, and the owner "agreed that it was a race, and the [other patron] paid [Garcia]." Investigator Garcia was not being "covert or quiet," but was instead "being loud and kind of arguing about getting paid." The other patron did not appear worried that appellant was standing nearby. There is no indication from Investigator Garcia's testimony that Mandujano was still standing nearby when this payout occurred or that Mandujano saw the payout. Investigator Garcia testified that he never had a direct conversation with either appellant or Mandujano.

Harris County Constable's Officer Sergeant A. Rubio testified that he had known appellant for many years and that appellant had been a coordinator for officers who wanted to work extra jobs. Sergeant Rubio obtained an extra job through appellant on a few occasions, including one day working security at El Herradero Ranch in 2013. Sergeant Rubio saw patrons openly holding cash and recording the races, and he believed that gambling was occurring at the property. Later that day, Sergeant Rubio informed appellant of what he observed and his concerns, and he told appellant that he would not work security at the property again.[3] Sergeant Rubio informed the Office of the Inspector General of what he had

---

[3] Appellant testified that Sergeant Rubio told him of his concerns about gambling at the property. He stated that, despite these concerns, Rubio did not arrest anyone on the day he worked at the property.

12

witnessed, and he called Noe Diaz, with the Texas Rangers, to report his observations.

Ranger Diaz testified concerning the types of extra jobs that DPS troopers are allowed to work. He stated that jobs where gambling occurs are strictly prohibited. When appellant applied to work an extra job at the El Herradero Ranch, he listed the nature of the business as "a Mexican rodeo," but Ranger Diaz testified that he would characterize the property as a "straight track," not as a rodeo. If appellant had listed "racetrack" on his application to work security, that would have "immediately" triggered concern among the officers who approve extra jobs. After receiving information from Sergeant Rubio concerning the activities at the El Herradero Ranch, Ranger Diaz began an investigation and eventually coordinated with Agent Duck's investigation and provided training assistance for the undercover agents.

Appellant testified on his own behalf. He testified that he has been a DPS Trooper since 1981. He started working security at El Herradero Ranch in 2008. It did not have a horse track at that time. From 2008 to 2013, a Mexican rodeo occurred at the property, and, in 2013, the owners added a horse track. He testified that his duty at El Herradero Ranch was to "provide security" and "enforce the law of the State of Texas." He stated that his job was not to conduct horse races but to conduct security and make the premises safe for patrons. Appellant characterized his conversation with Agent Aguillera as Aguillera's asking if gambling was occurring

13

at the property and appellant responding that "if it's in my view, I will take some action. But if it's not in my view, I cannot take some action." He stated that this was his way of giving a warning that gambling was prohibited, and if he saw gambling occurring, he "would do something about it." Appellant testified, "I was there to enforce all the laws. They never gambled in front of me. They never bet in front of me. I was never able to take any action on that."

On cross-examination, appellant had the following exchange with the State:

[The State]:     We're having horses racing, certainly the idea must come to you that some people may want to bet on that?

. . . .

[Appellant]:     They bet everywhere. Everywhere betting is done.

[The State]:     Everywhere racing is, betting is done?

[Appellant]:     In everything. You go to Reliant Park, you go to [Minute Maid] Park, you go to boxing, you go to anywhere, betting is done.

[The State]:     So certainly based on your training and experience, you can expect betting to be going on at that facility; is that correct?

[Appellant]:     It's a possibility. If they do it in front of me, I'm going to take action.

Appellant testified that none of the security officers working with him approached him to inform him that betting was occurring. He stated that the officers are "supposed to take action" if they see betting occurring, and that they know they are supposed to take action because they are police officers.

14

Appellant objected at trial to the admission into evidence of the testimony of Agent Duck and Investigator Garcia that, in their opinion, appellant was conducting the race and aiding the racing as improper testimony on legal issues. He also objected to the trial court's admission of evidence of the extraneous offense of a third party at the guilt/innocence stage of trial as improperly prejudicial and irrelevant. He further objected to the trial court's admission of statements made to a third party outside of appellant's presence as evidence of his guilt. The trial court overruled all of appellant's objections.

The jury charge included a law of parties instruction and thus authorized the jury to find appellant guilty of the offense of racing without a license either as the primary actor or as a party to the offense. No one other than appellant was identified as a primary actor in the charge. The law of parties portion of the application paragraph stated:

> [I]f you find from the evidence beyond a reasonable doubt that on or about the 5th day of October, 2013, in Harris County, Texas, an unknown person or persons, did then and there unlawfully, intentionally or knowingly conduct a horse race without having a racetrack license from the Texas Racing Commission, and the unknown person or persons knew or reasonably should have known that another person was betting on the final outcome of said race, and that the defendant, Richard Rene Rivera, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid the unknown person or persons to commit the offense, if he did, then you will find the defendant guilty of a violation of the Texas Racing Act, as charged in the indictment.

15

The jury found appellant guilty of the offense of racing without a license. The trial court assessed appellant's punishment at two years' confinement, suspended for two years, and a $2,000 fine. This appeal followed.

## Racing Without a License

In his first issue, appellant contends that the State presented insufficient evidence that he conducted a horse race without a racetrack license as a primary actor, as alleged in the indictment. In his eleventh issue, appellant contends that the trial court erred in including an instruction on the law of parties in the charge because the State presented no evidence that someone else was the primary actor for the offense of conducting an illegal race and no evidence that appellant intentionally aided in committing this offense, as required by the statute. We consider these issues together.

### A. Standard of Review of Sufficiency of the Evidence

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett*

16

*v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008).  The jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony.  *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted).

We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder.  *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  We afford almost complete deference to the jury's credibility determinations.  *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).  We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").  Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt.  *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011) (quoting *Clayton*, 235 S.W.3d at 778).  "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the

conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "[A]ll the evidence the jury was permitted, properly or improperly, to consider must be taken into account in determining the . . . sufficiency of the evidence." *Barnes v. State*, 62 S.W.3d 288, 297–98 (Tex. App.—Austin 2001, pet. ref'd).

## B. Conducting a Horse Race Without a Racetrack License as a Primary Actor

The Texas Racing Act, under which appellant was convicted, provides:

(a) A person commits an offense if the person:

> (1) Conducts a greyhound or horse race without a racetrack license; and
>
> (2) Knows or reasonably should know that another person is betting on the final or partial outcome of the race.

(b) An offense under this section is a felony of the third degree.

TEX. REV. CIV. STAT. ANN. art. 179e, § 14.16 (West Supp. 2016). Thus, to establish that appellant committed the offense of conducting a horse race without a racetrack license as a primary actor, the State had to prove that appellant "conduct[ed] a . . . horse race without a racetrack license" and that appellant "kn[ew] or reasonably should [have] know[n] that another person was betting on the final outcome of the race." *See id.*

The Texas Racing Act does not define the term "conducts."[4]  The Court of Criminal Appeals has held that, when interpreting a statute, "an undefined word or phrase should be construed and understood according to its common, every day usage." *Hanna v. State*, 426 S.W.3d 87, 92 (Tex. Crim. App. 2014); *see also* TEX. GOV'T CODE ANN. § 311.011(a) (West 2013) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). "Jurors may 'freely read [undefined] statutory language to have any meaning which is acceptable in common parlance.'" *Kirsch v. State*, 357 S.W.3d 645, 650 (Tex. Crim. App. 2012) (quoting *Denton v. State*, 911 S.W.2d 388, 390 (Tex. Crim. App. 1995)).

Appellant and the State have offered various definitions of "conduct" when used as a verb in order to aid our interpretation of Texas Racing Act section 14.16.[5]

---

[4] One other Texas criminal statute uses "conducts" as a verb: Penal Code section 34.02, which concerns money laundering.  *See* TEX. PENAL CODE ANN. § 34.02(a)(2) (West Supp. 2016) ("A person commits an offense if the person knowingly . . . conducts, supervises, or facilitates a transaction involving the proceeds of criminal activity.").  As with the Texas Racing Act, the Penal Code does not define "conducts" when used as a verb. *But see id.* § 1.07(a)(10) (Vernon Supp. 2015) (defining "conduct," when used as a noun, as "an act or omission and its accompanying mental state").  And, as with the Texas Racing Act, no Texas court has interpreted the meaning of "conducts" in the context of section 34.02.

[5] The Fourteenth Court of Appeals recently decided a case arising out of this same incident involving another off-duty police officer working an extra job as security at El Herradero Ranch.  *See Hurd v. State*, 495 S.W.3d 592 (Tex. App.—Houston [14th Dist.] 2016, no pet.).  Although the appellant in that case challenged the applicability of article 14.16 to him as well as the sufficiency of the evidence to convict him as a primary actor or as a party, our sister court did not analyze the

19

The State cites the Merriam-Webster Dictionary, which defines "conduct" as "to direct or take part in the operation or management of" and "to direct the performance of." *Conduct*, MERRIAM-WEBSTER.COM, www.merriam-webster.com/dictionary/conduct (last visited Nov. 14, 2016). The American Heritage Dictionary defines "conduct" as "to direct the course of; manage or control." *Conduct*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://ahdictionary.com/word/search.html?q=conduct (last visited Nov. 14, 2016); *see also Conduct*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY, www.yourdictionary.com/conduct#websters (last visited Nov. 14, 2016) (defining "conduct" as "to manage, control, or direct").

Each of these definitions of "conduct" implies a degree of management, control, and authority over what is being conducted. Thus, in the context of section 14.16, a person "conducts a horse race" if he directs or takes part in the operation or management of a horse race, or directs the performance of the race, or controls the race. And he violates section 14.16 if he performs such functions without a racetrack license and he knows or reasonably should know that another person is betting on the outcome of the race. There is no evidence in the record that appellant was a person required to have a racetrack license. There is no evidence in the record to

language of article 14.16 or specifically define what it means to "conduct" a horse race.

20

show that appellant directed the operation or management of the racetrack, the racing operation, or the performance of the races.

Instead, the evidence reflects that, in addition to generally ensuring the security of the property and the safety of the patrons, appellant's only action in connection with the actual races themselves was to ensure that patrons stayed off the track during races by pulling a rope back and forth across the track. These actions do not require a racetrack license and do not constitute management, control, or direction of the operation, the course, or the performance of a horse race without a license. We therefore conclude that the State presented insufficient evidence that appellant was guilty as the primary actor of conducting a horse race at which betting was occurring without a racetrack license.

**C. Conducting a Horse Race Without a Racetrack License as a Party**

The State points out, however, that the jury charge authorized the jury to convict appellant as a party to the offense under the law of parties. On appeal, appellant argues that the instruction was improperly given and that the evidence is insufficient to support his conviction under the law of parties. We therefore must consider whether the State presented sufficient evidence that appellant was guilty as a party of the criminal offense of conducting a horse race without a license.

"An instruction on the law of parties should be submitted to the jury when the evidence adduced at trial shows the active participation in the offense by two or more

persons." *Gilmore v. State*, 397 S.W.3d 226, 243 n.24 (Tex. App.—Fort Worth 2012, pet. ref'd). If the State is to prove a defendant's guilt as a party beyond a reasonable doubt, the State must first prove the guilt of another party as the primary actor. *Richardson v. State*, 879 S.W.2d 874, 882 (Tex. Crim. App. 1993); *Barnes*, 62 S.W.3d at 296. To support an instruction on the law of parties, the State need not establish the identity of the primary actor in the commission of the offense; rather, it is sufficient that the State prove conduct by a third party constituting the offense and an act by the accused committed with the specific intent to promote or assist the conduct. *See Nelson v. State*, 405 S.W.3d 113, 126 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd); *Mullins v. State*, 173 S.W.3d 167, 174 (Tex. App.—Fort Worth 2005, no pet.); *Barnes*, 62 S.W.3d at 296. "To establish guilt under the law of parties, the evidence must show that, at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose." *Nelson*, 405 S.W.3d at 123.

"In general, an instruction on the law of parties may be given to the jury whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999); *Ryser v. State*, 453 S.W.3d 17, 28 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). The trial court may include this instruction in the charge if evidence supporting the theory has been introduced at trial, even if the indictment

alleges only that the defendant acted as a principal actor. *Ryser*, 453 S.W.3d at 28. Under the law of parties, a person is criminally responsible as a party to an offense if the offense is "committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West 2011); *Nelson*, 405 S.W.3d at 123. A person is criminally responsible for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011).

Further, "it must be shown that, in addition to the illegal conduct by the primary actor, the accused harbored the specific intent to promote or assist the commission of the offense." *Barnes*, 62 S.W.3d at 296; *see Richardson*, 879 S.W.2d at 882. The accused must know that he was assisting in commission of the offense. *Barnes*, 62 S.W.3d at 296; *see Amaya v. State*, 733 S.W.2d 168, 174–75 (Tex. Crim. App. 1986). This "agreement, if any, *must be before or contemporaneous* with the criminal event." *Barnes*, 62 S.W.3d at 296 (emphasis in original); *see Beier v. State*, 687 S.W.2d 2, 3–4 (Tex. Crim. App. 1985). "The evidence must show that *at the time of the commission of the offense,* the parties were acting together, each doing some part of the execution of the common design." *See Barnes*, 62 S.W.3d at 297 (emphasis in original).

"The State must show more than mere presence to establish participation in a criminal offense." *Id.* (citing *Valdez v. State*, 623 S.W.2d 317, 321 (Tex. Crim. App. 1981)). The accused's "[m]ere presence or even knowledge of an offense does not make [him] a party to the offense." *Barnes*, 62 S.W.3d at 297; *see Oaks v. State*, 642 S.W.2d 174, 177 (Tex. Crim. App. 1982). In determining whether a defendant participated in the commission of an offense as a party, the fact finder may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the defendant that show an understanding and common design to commit the offense. *Barnes*, 62 S.W.3d at 297.

Here, the jury charge instructed the jury that it could find appellant guilty under the law of parties

> if you find from the evidence beyond a reasonable doubt that on or about the 5th day of October, 2013, in Harris County, Texas, an unknown person or persons, did then and there unlawfully, intentionally or knowingly conduct a horse race without having a racetrack license from the Texas Racing Commission, and the unknown person or persons knew or reasonably should have known that another person was betting on the final outcome of said race, and that the defendant, Richard Rene Rivera, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid the unknown person or persons to commit the offense.

Appellant argues that the "unknown person or persons" mentioned in the jury charge presumably refers to the owners of the El Herradero Ranch. But the State presented no evidence beyond mere speculation that any person who owned or

24

operated the racetrack committed the offense of conducting a horse race without a racetrack license and "knew or reasonably should have known that another person [was] betting on the final or partial outcome of the race." *See* TEX. REV. CIV. STAT. ANN. Art. 179e, art. 1, sec. 14.16(a). There was simply nothing in the record to convict any person as a primary actor of the offense of conducting a horse race without a racetrack license.

The only person fitting the description of an owner or manager of the racetrack at El Herradero Ranch was Reginald Mandujano. Investigator Garcia identified Mandujano as one of the owners of the property and presented evidence that he was present at the racetrack on at least one occasion. Garcia also testified that betting occurred among patrons on horse races at El Herradero Ranch, was "open" and "obvious" when he was walking through the crowds, and occurred each time undercover agents visited the property. On the occasion when Mandujano was present, he was asked to decide a dispute between Garcia and another patron with whom Garcia had made a bet as to whether a race had occurred. Mandujano reviewed a tape of the race and determined that a race had occurred. That was all he was asked to do. The patron then paid Garcia. But there is no indication in the record that Mandujano was still nearby when this payout occurred or that he saw the payout. Garcia testified that he never had a direct conversation with Mandujano.

There was no evidence that Mandujano personally conducted the operation of the racetrack or managed, controlled, or directed the races at the site.

The State presented no testimony concerning who was in charge of conducting the horse races, such as whether the owners of the property were in charge or whether another individual was in charge of managing the business of the racetrack. The only testimony that the State presented concerning the owners' involvement with the racetrack was Investigator Garcia's testimony concerning Mandujano's resolution of the dispute Garcia had with a patron about whether a race had occurred and Garcia's testimony that the owners' family members worked at the property collecting entrance fees at the gate and selling food and beer. The State presented no testimony that any of the owners, if they were the ones conducting the races, were aware of the betting that was occurring among the patrons along the sidelines of the track before and after races. The State presented no evidence that the owners were present when betting was occurring and saw bets being placed or money exchanging hands after a race.[6]

---

[6] We note that, in *Hurd*, the Fourteenth Court concluded that Mandujano knew or reasonably should have known that others were betting on the outcomes of races. 495 S.W.3d at 597–98. The Fourteenth Court based this conclusion on the facts that Mandujano owned El Herradero Ranch, he was observed at the racetrack on a race day, he paid the employees, and the betting was "open and pervasive." *Id.* at 597. However, there is no evidence in the record in this case that Mandujano, despite being an owner of the property and being present at a race, operated the racetrack or otherwise conducted the horse races, or himself saw or aided or participated in illegal betting. We therefore disagree with the Fourteenth Court that the State

Based on this record, we conclude that the State presented no evidence that any property owner, or any other unidentified individual, conducted an identifiable horse race without a racetrack license when he knew or reasonably should have known that another person was betting on the final outcome of that race. There was, therefore, insufficient evidence to convict any person of the offense of violating the Texas Racing Act. *See* TEX. REV. CIV. STAT. ANN. art. 179e, § 14.16.

There was likewise no evidence that, at time of the commission of a proven offense, appellant had an agreement with a primary actor entered with the specific intent to promote or assist in the commission of the offense and that "the parties were acting together, each contributing some part towards the execution of their common purpose." *See Barnes*, 62 S.W.3d at 296–97. Appellant could be held criminally responsible for the conduct of another under the law of parties only if, acting with intent to promote or assist the commission of the offense, he "solicit[ed], encourage[d], direct[ed], aid[ed], or attempt[ed] to aid the other person to commit the offense." *See* TEX. PENAL CODE ANN. § 7.02(a)(2); *see also Nelson*, 405 S.W.3d at 123 (stating that, to establish guilt under law of parties evidence must show that, at time of offense, "the parties were acting together, each contributing some part towards the execution of their common purpose").

established Mandujano's criminal liability as a primary actor beyond a reasonable doubt.

There was no evidence of any agreement between appellant and another party to the offense to conduct a horse race without a racetrack license at the time of appellant's alleged offense. And there was no evidence of how appellant and one or more of the parties acted together to contribute to the execution of a common purpose of committing the offense. At most, the evidence showed that appellant was present at a horse race at which betting was occurring.[7] Mere presence during the commission of an offense is legally insufficient evidence to convict a person of an offense as a party. *See Barnes*, 62 S.W.3d at 297 (stating that State must show more than mere presence to establish participation in criminal offense); *see also Nelson*, 405 S.W.3d at 126 (stating that when defendant is not primary actor, State must prove conduct constituting offense plus act by defendant done with specific intent to promote or assist such conduct). As a result, the State failed to prove that appellant

---

[7] In concluding that the State presented sufficient evidence that the defendant violated article 14.16 as a party in *Hurd*, the Fourteenth Court stated, "The conviction here does not rest on proof of [Hurd's] status within an enterprise that merely had criminal potential. Rather, [Hurd's] conviction rests on evidence of his actions as a security officer coupled with evidence that he affirmatively encouraged hand-to-hand betting." 495 S.W.3d at 599. After an undercover officer complained to Hurd that he "wasn't hardly winning anything," Hurd told the officer that "he should have bet $500 on the previous race." *Id.* at 598. There was no evidence in this case that appellant affirmatively encouraged any of the patrons at El Herradero Ranch to engage in betting on the horse races.

was guilty of the charged offense as a party.[8] *See Richardson*, 879 S.W.2d at 882;

*Barnes*, 62 S.W.3d at 296.

We hold that the State failed to present sufficient evidence to support appellant's conviction, either as the primary actor or as a party.

We sustain appellant's first issue.[9]

---

[8] We note that Penal Code section 7.03(2) provides that "[i]n a prosecution in which an actor's criminal responsibility is based on the conduct of another, the actor may be convicted on *proof of commission of the offense* and that he was a party to its commission, and it is no defense . . . that the person for whose conduct the actor is criminally responsible has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or of a different type or class of offense, or is immune from prosecution." TEX. PENAL CODE ANN. § 7.03(2) (West 2011) (emphasis added); *Roberts v. State*, 319 S.W.3d 37, 48 (Tex. App.—San Antonio 2010, pet. ref'd) (holding that primary actor's acquittal on three counts does not, by itself, "prevent appellant's conviction on these same counts"). Here, however, the State has presented no evidence that a primary actor committed the charged offense of racing without a license. Section 7.03(2), therefore, does not apply to this case.

[9] Because we hold that the State failed to present sufficient evidence to uphold appellant's conviction, either as the primary actor or as a party, and we thus render a judgment of acquittal, we do not address the remainder of appellant's issues.

## Conclusion

We reverse the judgment of the trial court and render a judgment of acquittal.

Evelyn V. Keyes
Justice

Panel consists of Justices Jennings, Keyes, and Bland.

Justice Jennings, dissenting.

Publish. TEX. R. APP. P. 47.2(b).